NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0808n.06

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

**Dec 18, 2009**

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff-Appellee, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| v. | ) | DISTRICT OF KENTUCKY |
| | ) | |
| JOHN A. ROBINSON, | ) | O P I N I O N |
| | ) | |
| Defendant-Appellant. | ) | |

BEFORE:    MERRITT, CLAY and McKEAGUE, Circuit Judges.

**McKEAGUE, Circuit Judge.**  Defendant John A. Robinson was charged with and found guilty of one count of attempted bank burglary.  He was sentenced to a prison term of seventy-two months.  On appeal, he contends that his trial was marked by several errors requiring reversal of his conviction.  He also contends the district court abused its discretion and imposed an unreasonable sentence.  On due consideration, we find no error warranting relief.  For the reasons that follow, the defendant's conviction and sentence are affirmed.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

On September 10, 2007, at about 2:00 a.m., the alarm at the Fifth Third Bank located near Erlanger, Kentucky was triggered.  When Elsmere Police Officer Steve Dickerson arrived at the bank, he observed a person wearing dark clothing and white shoes and gloves run into a grassy field behind the bank.  Dickerson pursued the suspect but lost contact in the darkness as the suspect

reached the woods next to the field. Dickerson called for assistance from a canine unit. Boone County Sheriff Deputy Jeff Ruber responded with his police dog. After an hour of searching the woods and area around a nearby apartment complex, nothing had been turned up.

At about 3:47 a.m., Erlanger Police Officer Dave Lillich showed up with his German shepherd police dog, Sombie. Sombie discovered several bags of tools in the knee-high grass of the grassy field. Among the tools were a drill, screwdrivers, pliers, duct tape, wooden dowel rods (with hooks taped to the ends), hand-held grinder, extension cord, and a hydraulic "porta-power" tool.

At about 4:15 a.m., a resident of the neighboring apartment complex, Eugene Harris, advised the police that he had, from his balcony, observed a suspicious looking man in the parking lot. Harris said that when he asked the man what he was doing, he answered, "this is my car." He then got into and drove off in what Harris described as a large dark car—a Ford or a Continental. Acting on the tip, Officer Lillich and Deputy Ruber found a black Lincoln Continental parked near Harris's condominium. It was unoccupied. As Sombie searched around the area, he alerted at a fenced-in trash collection area. Lillich ordered anyone inside to come out. As soon as Sombie entered the fenced-in area, a man jumped out and took off running. With Sombie's help, the officers managed to apprehend the suspect, who turned out to be defendant John Robinson.

The officers searched the area where Robinson had been hiding and found dark clothing, white gym shoes, tan gloves, a flashlight and a ski mask. Inside the Lincoln, owned by Robinson's foster brother, the officers found mail bearing Robinson's name, road atlases and maps, a card bearing the name and number of a locksmith, driving directions to various Fifth Third Bank locations, a bank deposit bag containing seven $100 bills, dowel rods (with fish hooks) and bags

(like those found in the grassy field) containing "porta-powers," extension cords, sledgehammers, bolt cutters, pry bar, long rods, hammers, black electrical tape, a stethoscope for tools, and a snake-type device.

Investigation at the bank revealed that the night deposit box lock had been drilled and the plastic or fiberglass covering of the box had been ground or drilled, creating white dust. Duct tape was also found at the night deposit box. After Robinson was arrested and advised of his rights, he declined to make a statement to the police.

Robinson was subsequently charged by indictment in the Eastern District of Kentucky with a single count of attempting to enter a bank with intent to commit a felony, in violation of 18 U.S.C. § 2113(a). Attorney Gary Sergent was appointed to represent Robinson. Robinson moved to suppress evidence found in the Lincoln. The motion was denied and the ruling has not been appealed. On February 7, 2008, the district court granted Robinson's motion to permit withdrawal of counsel, based on "professional differences." Attorney F. Dennis Alerding was appointed. On February 20, Robinson, acting *pro se*, and observing that Alerding seemed to be too busy to properly prepare for Robinson's upcoming trial date, requested the court consider appointing another attorney. The request was inserted in Robinson's *pro se* motion for a bill of particulars and discovery. The district court rejected the motions, noting that Robinson was represented by an experienced member of the federal public defender panel, and directed the Clerk to disregard any further *pro se* submissions by Robinson.

As trial commenced on March 3, Robinson did not renew his request for appointment of new counsel or otherwise express dissatisfaction with Alerding's representation. The jury trial lasted

three days. After the prosecution presented proofs consistent with the above summary of the police officers' findings in the vicinity of the Fifth Third Bank on September 10, 2007, defendant Robinson testified, offering an innocent explanation for his presence and unusual behavior in Erlanger.

Robinson testified that he was a resident of Jeffersontown, Kentucky, just outside Louisville. He was the owner of a small trucking company and earned extra money by repairing others' trucks and by buying cars at auction, fixing them and reselling them. This explained his possession of numerous tools.

On the evening of September 9, 2007, Robinson explained, he received a call from a man whose semi-truck had broken down at a rest stop in northern Kentucky. He agreed to drive there for $50 and charged $50/hour to work on the truck. On the way to the rest stop in a black Lincoln, Robinson dropped off an acquaintance, Hector Gonzales, at an apartment complex in Erlanger (approximately 80 miles northeast of Jeffersontown), which happened to be near a Fifth Third Bank. Gonzales took bags of tools with him, saying he needed a couple of hours. Robinson proceeded to the rest stop, where he found the semi-truck and repaired it.

He testified that he also assisted another motorist at the rest stop with her Toyota Celica. In fact, in the early morning hours of September 10, he sought out a nearby auto parts store (a 24-hour AutoZone store) to buy a replacement distributor cap. He produced a receipt showing that the purchase had been made at 1:37 a.m. Robinson believed it was about 3:00 a.m. when he returned to the rest stop and replaced the Toyota distributor cap.

He then returned to Erlanger to pick up Gonzales. As he approached the apartment complex, he noticed police in the adjacent field. Because Gonzales was not waiting where Robinson had

dropped him off the previous evening, Robinson parked his car and walked around the parking lot to make himself visible. After a brief exchange with an apartment resident, who asked what he was doing, Robinson got back in his car and began to drive off. He parked again to secure the hood of the car when he realized it was unlatched. As he was about to re-enter the car, Robinson noticed a police officer approaching. Rather than risk a confrontation with the police, Robinson decided to hide behind a fence.

Robinson had an explanation for this rather unusual behavior, too. He testified that he had been pulled over by the police near Louisville at about 3:00 a.m. one morning a few weeks earlier. What began on that occasion as a routine traffic stop became something of a traumatic event. Robinson was ordered to get out of his car and get down on the ground. He was handcuffed and placed in a patrol car for a few minutes before the officers realized he was not the "John Robinson" who was wanted on a warrant for murder in Florida. It was because of this earlier case of mistaken identity that Robinson said he wanted to avoid another encounter with the police.

So, when the officers approached the fenced-in area where he was hiding, he decided to take off and run. He admitted this was "stupid." He ran for a couple of minutes before he was caught and arrested.

On cross-examination, Robinson admitted he had been previously convicted, in 1995, of money laundering, causing transportation of stolen vehicles, and failing to file timely tax returns. He had been sentenced to a prison term of 162 months for these offenses and was still subject to post-release supervision on September 10, 2007. He further acknowledged that by leaving the Western District of Kentucky and traveling to the rest stop in northern Kentucky without his

supervising probation officer's express permission, he had violated a condition of his supervised release. Robinson explained that since the need to drive to northern Kentucky had come up unexpectedly on a Sunday evening, he planned to advise his probation officer the next day.

After about three hours of deliberation, the jury reached its verdict, finding defendant Robinson guilty as charged of attempted bank burglary. Shortly thereafter, Robinson's attorney, Dennis Alerding, was allowed to withdraw and new counsel, Derek Gordon, was appointed. On July 22, 2008, the district court sentenced Robinson to a 72-month term of imprisonment, followed by three years of supervised release.

Shortly after filing his notice of appeal, Robinson sought and obtained substitution of appointed counsel, replacing Gordon with David Mills. On appeal, Robinson, asserts eight claims of error.

## II. ANALYSIS

### 1. References to Supervised Release

Defendant Robinson has no objection to the district court's having allowed the prosecuting attorney to impeach him based on his prior convictions under Fed. R. Crim. P. 609, for which he acknowledged he was imprisoned for some thirteen and a half years. He contends the district court erred, however, when it allowed the prosecuting attorney to elicit answers from him acknowledging (1) that he continued to be subject to post-release supervision at the time of the attempted bank burglary; and (2) that, absent permission from his supervising probation officer, he was not allowed to travel outside the Western District of Kentucky (i.e., to Erlanger or the rest stop).

The question of the admissibility of such evidence first came up before Robinson testified. The district court prohibited the government from introducing such evidence through the probation officer in its case in chief. However, the court advised that if Robinson testified, he would be subject to cross-examination like any other witness and his testimony would be subject to impeachment as appropriate. *Id.* Declining to give an anticipatory advisory opinion on the bounds of admissibility of his supervised release status, the district court elected to wait until Robinson decided to testify and, if he did, to entertain any objections at that time. Robinson's attorney did not object to this approach and it was with this understanding that Robinson took the stand the next day.

Predictably, the Assistant U.S. Attorney's cross-examination began with questions about Robinson's prior convictions and supervised release status. The questions about Robinson's supervised release were ostensibly justified by Robinson's direct testimony about his legitimate purpose for being in the vicinity of the Fifth Third Bank in Erlanger. Robinson freely acknowledged knowing that he was not supposed to drive to Erlanger and the rest stop without his probation officer's permission. He also acknowledged that he had not obtained permission, but explained that such permission had been freely granted in the past. Because the need to travel outside the district came up on a Sunday evening, he believed it would be acceptable to advise his probation officer Monday. No objection was interposed during this colloquy.

Yet, Robinson now contends admission of the testimony resulted in unfair prejudice substantially outweighing its probative value. Moreover, he contends the injury caused by the error was compounded when the AUSA mentioned it in closing argument.

Ordinarily, evidentiary rulings are reviewed for abuse of discretion. *Barnes v. City of Cincinnati*, 401 F.3d 729, 741 (6th Cir. 2005). A reviewing court will find an abuse of discretion only if firmly convinced that a ruling was based on clearly erroneous fact findings, an improper application of the law, or use of an erroneous legal standard. *Id.* Yet, where the district court did not make a ruling because it was not asked to, objection is deemed forfeited and the reviewing court may review only for plain error. To win relief on appeal, Robinson must show that "(1) an error occurred; (2) the error was obvious or clear; (3) the error affected his substantial rights; and (4) the error seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Mayberry*, 540 F.3d 506, 512 (6th Cir.2008) (quoting *United States v. Cline*, 362 F.3d 343, 348 (6th Cir.2004)).

In support of his argument, Robinson cites *United States v. Morrow*, 2005 WL 3163801 (D.D.C. 2005), for the proposition that a supervised release violation does not necessarily involve dishonesty and does not therefore bear on the witness's truthfulness. Yet, the prosecution did not use the fact of Robinson's failure to seek permission to demonstrate that he violated the conditions of supervised release and is therefore dishonest. Rather, it legitimately used the evidence to call into question Robinson's innocent and facially legitimate reason for being in the vicinity of the Fifth Third Bank some 80 miles from home at 4:00 a.m. In other words, it was Robinson who assumed the risk by opening the door to such evidence through his direct testimony, despite prior notice from the district court of this possibility. Robinson assumed the risk and did not even object to the questioning.

Moreover, the revelation that Robinson failed to seek permission before driving to Erlanger came right after the jury heard that he had just been released from prison after spending thirteen and a half years behind bars. After learning about part of Robinson's rather serious criminal background, the notion that Robinson suffered substantial unfair prejudice in the minds of the jurors as a result of the relatively innocuous mention of his supervised release status is far from persuasive. Further, the AUSA did not unduly emphasize Robinson's supervised release status or his failure to obtain prior permission to travel. The AUSA merely repeated in closing what Robinson himself had testified to.

Robinson has thus failed to show that the district court abused its discretion in any way by permitting the unobjected-to questioning or by permitting the prosecution's unobjected-to reference to Robinson's answers in closing argument. To the contrary, the district court appears to have handled the matter prudently: (1) by prohibiting introduction of the information in the government's case in chief; (2) by advising Robinson that admissibility would pose a different question if he took the stand and was subject to cross-examination; and (3) by refraining from issuing any premature advisory opinion before testimony was offered and an objection asserted. Robinson has failed to show any error, much less clear error of such a magnitude as to render the trial unfair. This first claim of error is therefore rejected.

## 2. References to Post-Arrest Silence

When Robinson was apprehended and arrested, officers advised him of his *Miranda* rights and he refrained from making any statement to the police. During its case in chief, the prosecution elicited testimony from Erlanger Police Lieutenant Kevin Gilpin to the effect that Robinson was

twice advised of his right to remain silent after he was arrested and twice stated that he did not want to talk. This testimony was corroborated by Erlanger Police Detective Greg Aylor. Robinson contends this testimony was an improper use of his silence to impeach him, in violation of his due process rights, citing *Greer v. Miller*, 483 U.S. 756, 762-63 (1987). Again, Robinson did not object to the testimony; the error is remediable only if the plain error standard is met.

The government maintains no reversible error occurred because the references to Robinson's silence were not emphasized or exploited by the prosecution and did not prejudice him. Indeed, *Greer* makes clear that the reviewing court must evaluate any improper reference to the defendant's silence to determine whether it was *used* against him and whether it actually caused damage. *Id.* 483 U.S. at 763-64, n.5 (emphasis in original). *See United States v. Weinstock*, 153 F.3d 272, 280 (6th Cir. 1998). The *Greer* Court denied relief despite an improper reference to the defendant's silence, because the prosecutor did not "undertake impeachment on" or "call attention to" the defendant's silence, thereby distinguishing *Doyle v. Ohio*, 426 U.S. 610 (1976).

Here, similarly, the AUSA simply asked each officer whether Robinson made a statement and, upon receiving a negative response, moved on. The AUSA did not ask any follow-up questions of the officers, did not use Robinson's silence to impeach him during cross-examination when he told his story at trial, and did not comment on his silence during closing argument. Because no objection was made to the testimony, the district court did not have occasion to order the jury to disregard the answers or to give a curative instruction. Had the district court done so *sua sponte*, it might have needlessly brought undue attention to Robinson's post-arrest silence, thereby doing more harm to Robinson's cause than the relatively innocuous answers that he now belatedly objects to.

In the face of all the circumstantial evidence amassed against Robinson, the credibility of his own testimony was critical to his defense. For the jurors to have heard that Robinson had the opportunity to make a statement explaining his presence and unusual behavior, but declined to do so, cannot have bolstered his credibility in their eyes. Yet, as the Supreme Court noted in *Doyle*, "post-arrest silence is insolubly ambiguous." *Doyle*, 426 U.S. at 617. Where the prosecuting attorney did not exploit the references to Robinson's silence to anticipatorily impeach him, did not even mention his silence in closing argument, and did not take advantage of the ambiguity of his silence to mislead the jury, no reversible error is presented. *See United States v. Forrest*, 402 F.3d 678, 686 (6th Cir. 2005) (finding no reversible error where prosecutor impliedly, albeit deliberately, commented on the defendant's silence, but did not make extensive comments, did not mislead the jury, and did not cause unfair prejudice).

Here, as in *Forrest*, the AUSA may have ventured across the line in her questioning of the police witnesses—and appears to have done so deliberately. But any error can hardly be deemed to amount to such plain error that Robinson was denied a fair trial. It follows that Robinson's second claim of error must also be rejected.

**3. Ineffective Assistance of Counsel**

Robinson contends his trial counsel rendered ineffective assistance during his closing argument. Such a claim is ordinarily deferred until post-conviction proceedings under 28 U.S.C. § 2255, when an evidentiary hearing can be held to ascertain whether counsel's conduct was motivated by sound strategy. *United States v. Watkins*, 509 F.3d 277, 283 (6th Cir. 2007). However, if the

record is adequately developed, an ineffective assistance claim may be considered on direct review.
*Id.*

To demonstrate that counsel's performance was constitutionally deficient, Robinson must show that it "fell below an objective standard of reasonableness" and that it prejudiced the defense. *Strickland v. Washington*, 466 U.S. 688, 687-88 (1984). The reviewing court's scrutiny of counsel's performance is "highly deferential;" the defendant must overcome the presumption that the challenged action might be considered sound strategy. *Id.* at 689. To show prejudice, Robinson must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

In complaining about his attorney's closing argument, Robinson focuses on a handful of statements that, viewed in isolation, appear to be unusual and counterproductive. Yet, we are obliged to view counsel's challenged statements in context. *See Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003) (recognizing that counsel is given wide latitude in making closing argument and that judicial review is therefore highly deferential). Reviewing the closing argument as a whole reveals that, although counsel's style was unorthodox, his argument could reasonably be construed as urging the jurors: to use their common sense in evaluating the evidence; to accept, despite the strangeness of his client's story, that sometimes fact is stranger than fiction; and to follow the jury instructions requiring the government to prove its case beyond a reasonable doubt.

Yet, considering the ambiguity of counsel's statements, we are reluctant to deny the ineffective assistance claim on the merits based on the trial transcript alone. Rather than foreclose Robinson's right to pursue relief based on a fully developed record in collateral proceedings, we

deny the ineffective assistance of counsel claim as premature, without prejudice to Robinson's right to pursue the claim under § 2255.

### 4. Jury Instruction Defect

Robinson contends that due to the way two jury instructions may have been read in conjunction with each other, the jury was given the freedom to convict him of attempting to attempt a bank burglary, which is not a federal crime.

A challenge to the propriety of the jury instructions is reviewed for abuse of discretion. *United States v. Kuehne*, 547 F.3d 667, 679 (6th Cir. 2008). A judgment may be reversed based upon improper jury instructions only if the instructions, viewed as a whole, were confusing, misleading or prejudicial. *Id.*

The government contends Robinson waived this objection by failing to assert it before the jury instructions were finalized and given to the jury. The government argues that plain error review applies. *See United States v. Castano*, 543 F.3d 826, 833 (6th Cir. 2008). In the context of a jury instruction challenge, "plain error" will be found only where the jury instructions, taken as a whole, "were so clearly erroneous as to likely produce a grave miscarriage of justice." *Id.* (quoting *United States v. Newsom*, 452 F.3d 593, 605 (6th Cir. 2006)).

Robinson insists that he adequately preserved his objection to the jury instructions because he stated a sufficient objection in relation to the district court's answer to a jury question during deliberations, discussed below. *See Reynolds v. Green* 184 F.3d 589, 596 (6th Cir. 1999). However, contrary to Robinson's suggestion, the *Reynolds* court actually applied plain error review to a jury instruction objection that was not raised until after the jury had begun deliberating. It follows that

Robinson's instant jury instruction objection is reviewable only for plain error, requiring him to

show the instructions were so clearly erroneous as to likely produce a grave miscarriage of justice.

Instruction No. 13 defined the elements of the attempted bank burglary offense charged in

the indictment as requiring the government to prove beyond a reasonable doubt:

> 1.  That the Defendant entered, *or attempted to enter*, a bank or any building used in whole or in part as a bank;
>
> 2.  With the intent to commit a felony or larceny; and
>
> 3.  The deposits of the bank were insured by the Federal Deposit Insurance Corporation.

Dist. ct. dkt. no. 58, p. 16 (emphasis added).  Robinson does not deny that this is an accurate

statement of the essential elements of the charged violation of 18 U.S.C. § 2113(a).

Instruction No. 14 made it clear that Robinson was charged with attempted bank burglary.

To prove Robinson guilty of this offense, the instruction provided that the government was required

to prove beyond a reasonable doubt:

> 1.  that the Defendant intended to commit the crime of bank burglary; and
>
> 2.  that the Defendant did some overt act that was a substantial step towards committing the crime of bank burglary.

*Id.* at p. 17.  Further, the instruction went on to explain:

> Merely preparing to commit a crime is not a substantial step.  The Defendant's conduct must go beyond mere preparation, and must strongly confirm that he intended to commit bank burglary.  But the Government does not have to prove that the Defendant did everything except the last act necessary to complete the crime.  A substantial step beyond mere preparation is enough.

*Id.* Robinson acknowledges that this instruction, too, is an accurate statement of the law. It is entirely consistent with Sixth Circuit Pattern Criminal Jury Instruction 5.01.

Robinson does not claim that the language of either instruction, standing alone, is defective. Rather, he claims that when read in combination, they could potentially have misled the jury. He notes that Instruction No. 14 defines the attempt to commit an offense with reference to an offense, "bank burglary," that is defined in Instruction No. 13 as including *attempted* entry of a bank with felonious intent. Robinson thus reads the instructions as having potentially invited the jury to convict him of having attempted to attempt to enter the bank. The government responds that Instruction No. 14 simply defines the term "attempted" as it appeared in the foregoing Instruction No. 13.

We find the government's construction of the interplay of the two instructions to be more natural and sensible than Robinson's. In fact, the Committee Commentary following Sixth Circuit Pattern Instruction 5.01 expressly recognizes the appropriateness of using this attempt instruction in connection with an attempted bank robbery offense under 18 U.S.C. § 2113(a). Robinson's imagined confusion is based on a stilted, excessively literal reading of isolated words in the instructions, rather than on the sort of consideration of the instructions "as a whole" that the jury was instructed to undertake. *See* Instruction No. 1, dist. ct. dkt. no. 58, p.2. Robinson's construction is also at odds with the "common sense" the jurors were elsewhere instructed to employ in applying the instructions to the evidence. *See* Instruction No. 4, dist. ct. dkt. no. 58, p. 6. Absent some showing to the contrary, the jury is presumed to have followed the instructions. *United States v. Newsom*, 452 F.3d 593, 604-05 (6th Cir. 2006).

Robinson's semantic sophistry falls short of demonstrating that the instructions were so "confusing, misleading or prejudicial" as to be deemed erroneous. *Kuehne*, 547 F.3d at 679. It necessarily follows that Robinson has failed to demonstrate "plain error," that is, a defect "so clearly erroneous as to likely produce a grave miscarriage of justice." *Castano*, 543 F.3d at 833. We therefore reject this claim of error.

## 5. Adequacy of Supplemental Instructions

Robinson insists that the confusing nature of Instruction Nos. 13 and 14 is borne out by the questions posed by the jury during deliberations. With reference to No. 14, the jury asked for clarification of the terms "except the last act necessary to complete the crime" and "mere preparation is enough." On the same note paper, the jury also asked, "Do we have to have him at the night deposit box with unreasonable doubt?" Dist. ct. dkt. no. 60. After conferring with counsel, the district court responded to the jury in two forms. First, the judge called the jury into the courtroom and essentially read the contents of his own handwritten note to the jury. The note was then physically delivered to the jury. It bears the following partial answer to the jury's questions:

> The Court has received your question wherein you have inquired about the attempt instruction no. 14.
>
> The court's prior instruction is an accurate statement on the law regarding attempt.
>
> With regard to your request for clarity on the "except" and mere preparation is enough, I will direct you to the courtroom for a supplemental example of an illustration which may help you.
>
> As to your last question — "Do we have to have him at the night deposit box with unreasonable doubt?" The Court will direct you to the prior instructions. It is your job to determine if the government has proven beyond a reasonable doubt whether

the defendant is guilty of either bank burglary or attempted bank burglary as previously defined.

Dist. ct. dkt. no. 61.

In addition, the court gave the jury supplemental instructions on the record:

In answering the question that you have regarding mere preparation, Mr. Robinson's actions with respect to this case must go beyond mere preparation to the point where the crime would have been completed in all likelihood if it had not been interrupted by outside circumstances.

I'm going to give you an example . . . . [illustration omitted]

Again, by giving you this example, I'm not inferring that the evidence in this case is sufficient or insufficient. The important thing for you is for you to decide, within the instructions given, whether or not the United States has proven beyond a reasonable doubt whether the defendant committed the bank burglary or attempted bank burglary, as I have previously defined, as well as the written instruction which I've supplemented, as well as giving you the additional example of the murder.

I think it's important to ask yourself, in deciding the case as it relates to attempted bank burglary, did his conduct go beyond mere preparation and did it strongly confirm that he intended to commit bank burglary? The government does not have to prove that he did everything except the last act necessary to complete the crime. Now, you have asked for some additional clarification on except. Just use your common sense as to what that means. I don't really know if I can give you any more guidance than that, beyond that which I've already given you in the instruction.

A substantial step beyond mere preparation is enough. I want you to keep in mind that you should consider what I have just said together with all of the instructions that I have given you earlier. All the instructions are important, and you should consider them together as a whole. I would ask that you now return to the jury room and resume your deliberations. Hopefully, if your lunch hasn't been delivered yet, it will be delivered momentarily. Very well.

Trial tr. at 421-23.

Robinson does not object to the contents of any of these supplemental instructions. Still, he contends the district court abused its discretion by giving these supplemental instructions without

also directly answering the jury's question whether, in order to find Robinson guilty, they had to find beyond a reasonable doubt that Robinson was the person at the night deposit box. It is Robinson's position that, since the government did not prosecute him on the theory that he was an accomplice to a second offender, the jury absolutely had to find that Robinson was the one who did the damage to the night deposit box before fleeing. Robinson's counsel made this argument before the court gave its supplemental instructions, the government objected, and the court rejected Robinson's position.

The trial court's responses to legal questions that arise during jury deliberations are reviewed for abuse of discretion. *United States v. Davis*, 490 F.3d 541, 548 (6th Cir. 2007); *United States v. Nunez*, 889 F.2d 1564, 1568 (6th Cir. 1989). To show that reversal of his conviction is warranted, Robinson must meet the "high standard" of showing that the instructions, taken as whole, were confusing, misleading and prejudicial. *Davis*, 490 F.3d at 548; *United States v. Khalil*, 279 F.3d 358, 367 (6th Cir. 2002).

Citing *Nunez*, Robinson contends it was not enough for the trial court to recite the instructions already given. *Nunez*, 889 F.2d at 1568. He contends the district court had a duty "to clear up uncertainties that the jury brings to the court's attention." *Id.* (quoting *United States v. Giacalone*, 588 F.2d 1158, 1166 (6th Cir. 1978)).

The district court did not merely reiterate the original instructions. The court took pains to address the jury's questions carefully and with clarity. The court clearly recognized, as the *Nunez* court observed, "that questions from a deliberating jury present a dilemma for a trial court." *Nunez*, 889 F.2d at 1569. The court properly endeavored to clear up legal uncertainties without causing

prejudice and without invading the fact-finding province of the jury. *See id.* Had the court given

the jury the sort of yes or no answer urged by Robinson, it would have been intruding upon the jury's

fact-finding province. Instead, the court steered a prudent middle course.

Moreover, the district court's exercise of discretion is not measured by what it did not say.

The question is whether the supplemental instructions that *were* given by the court have been shown

to be confusing, misleading and prejudicial. This is a "high standard," which defendant Robinson

has failed to meet.

### 6. Denial of Right to Counsel

Robinson contends the district court committed structural error and violated his right to

counsel when it rejected his *pro se* request for appointment of new counsel. This issue deserves only

short shrift.

Approximately one month before his scheduled trial date, Robinson's first appointed counsel

was allowed to withdraw and was replaced pursuant to an order dated February 8, 2008. The CJA

appointment form was filed on February 19, 2008. The next day, Robinson, *pro se,* filed a motion

for discovery and bill of particulars. Within the body of the motion, Robinson expressed concern

about his newly appointed counsel Dennis Alerding, whom he had not yet met, as of February 15.

Robinson requested the court to consider appointment of another who was more available to prepare

for Robinson's trial, scheduled for March 3, but expressly objected to any continuation of the trial

date. The district court denied the motion for discovery and bill of particulars on February 21 in a

one-page order. The court noted that Robinson was represented by experienced counsel, advised

that the court would disregard any future *pro se* pleadings by Robinson, and instructed the Clerk to return any further *pro se* pleadings to Robinson without filing.

It is this summary treatment of his expressed "concern" about newly appointed counsel and his informal request to "consider" appointment of new counsel that Robinson now contends constitutes structural error. He argues that his informal request, mentioned in passing in the body of a *pro se* motion seeking discovery, triggered a duty in the district court to conduct an inquiry into the attorney-client relationship before denying the request. Yet, after the district court rejected Robinson's motion, there is no further indication that Robinson was in any way dissatisfied with Alerding's representation until after the verdict, when the district court permitted substitution of counsel prior to sentencing. Robinson has not cited a single renewed request for appointment of new counsel from the commencement of trial until after the verdict was rendered. Apart from the claim of ineffective assistance stemming from Alerding's closing argument, a claim that we have deferred for potential consideration in collateral proceedings under 28 U.S.C. § 2255, Robinson has not even alleged that he was in any way prejudiced by Alerding's representation of him.

On this record, it appears that Robinson was reassured once he became acquainted with Alerding and remained comfortable in the attorney-client relationship until after the jury rendered its unfavorable verdict. There is no reason to hold the district court abused its discretion when it denied Robinson's *pro se* request to consider appointing new counsel. *See Benitez v. United States*, 521 F.3d 625, 635 (6th Cir. 2008) (recognizing that trial court's denial of motion to substitute counsel is reviewed for abuse of discretion in light of court's wide latitude in balancing right to

counsel of choice against needs of fairness and demands of calendar). We therefore reject this claim of error as well.

### 7. Cumulative Effect of Trial Errors

Robinson argues that even if none of the above cited errors was sufficiently prejudicial individually to warrant reversal of his conviction, their cumulative effect resulted in a fundamentally unfair trial. In support, he cites *United States v. Trujillo*, 376 F.3d 593, 614 (6th Cir. 2004). "[E]rrors that might not be so prejudicial as to amount to a deprivation of due process when considered alone . . . may cumulatively produce a trial setting that is fundamentally unfair." *Id.* (quoting *United States v. Hernandez*, 227 F.3d 686, 697 (6th Cir. 2000)). Yet, this "cumulative error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors." *Trujillo*, 376 F.3d at 614 (quoting *United States v. Rivera*, 900 F.2d 1462, 1471 (10th Cir. 1990)). *See also United States v. Deitz*, 577 F.3d 672, 697 (6th Cir. 2009) (holding that cumulative-error analysis is not relevant where no individual ruling was erroneous).

Accordingly, considering the above analysis of Robinson's various claims of error, and finding that none of them have merit, we conclude the cumulative error argument is similarly unsupported.

### 8. Unreasonable Sentence

Robinson challenges his 72-month prison sentence as unreasonable. He notes that the government argued for a one-level upward departure from criminal history category III to IV, under U.S.S.G. § 4A1.3 based on the contention that the seriousness of his criminal history was otherwise under-represented. Yet, the court departed even further upward, applying the highest criminal

history category of VI. Then, based on the same considerations used to justify that upward departure, the district court varied upward from the Guidelines range with reference to the 18 U.S.C. § 3553(a) factors. Robinson contends the resultant sentence is unreasonable because the district court improperly treated him as a career offender, exaggerated the need to protect the public, and "double-counted" by using the same considerations to justify both an upward departure and an upward variance.

The district court's sentencing judgments are reviewed under the deferential "abuse of discretion" standard, evaluating both their procedural and substantive reasonableness. *Gall v. United States*, —U.S.—, 128 S.Ct. 586, 591, 598 (2007). A district court will be deemed to have abused its discretion if it committed significant procedural error, "such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range." *Id.* at 597. The standard for evaluating whether a sentence is substantively unreasonable is summarized in *Gall* as follows:

> When conducting this review, the court will, of course, take into account the totality of the circumstances, including the extent of any variance from the Guidelines range. If the sentence is within the Guidelines range, the appellate court may, but is not required to, apply a presumption of reasonableness. [*Rita v. United States,* 551 U.S. 338, 127 S.Ct. 2456, 2462-68, 168 L.Ed.2d 203 (2007)]. But if the sentence is outside the Guidelines range, the court may not apply a presumption of unreasonableness. It may consider the extent of the deviation, but must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance. The fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court.

*Gall*, 128 S.Ct. at 597.  In the Sixth Circuit, a rebuttable presumption of reasonableness is accorded to sentences within the properly calculated Guidelines range. *United States v. Vonner*, 516 F.3d 382, 389 (6th Cir. 2008).

Robinson's argument that the district court improperly treated him as a "career offender" under the Guidelines is not supported by the record. The district court explicitly acknowledged that the crime of conviction is not a crime of violence and that Robinson is not a "career offender," as defined in § 4B1 of the Guidelines.  Yet, for reasons amply discussed in the sentencing hearing, the court noted that "the record will show he's a career offender" for purposes of warranting both an upward departure and an upward variance.  Sent. tr. 58.  The district cited six distinct reasons for its decision to depart upward to criminal history level VI, including:  Robinson's nine prior felonies, the seriousness of which criminal history is under-represented in the Guidelines (due to the fact of Robinson's lengthy period of incarceration); the fact that Robinson's continued criminal behavior demonstrated he had learned nothing from imprisonment; the observation that Robinson appeared to be able to lead a law-abiding lifestyle only when incarcerated; and the conclusion that Robinson's history of recidivism demonstrated a heightened need to protect society.  The court further explained why it deemed criminal history levels IV and V inadequate.

Equally explicit is the district court's recitation of reasons for varying from the applicable Guidelines range of 46 to 57 months.   The court observed that rehabilitation did not seem to be a possible purpose of sentencing, but that a long prison term was needed to protect society because of Robinson's re-offending track record.  The court also observed, based on the trial evidence, that

although Robinson was convicted of only the single attempted bank burglary, the evidence showed that the Erlanger Fifth Third Bank heist was only one of several that were planned.

Robinson contends the court exaggerated the need for protection of society in light of the nonviolent nature of his criminal history. Yet, considering the deference owed to the district court's evaluation of the § 3553(a) factors, the 72-month sentence hardly smacks of unreasonableness. *See Gall*, 128 S.Ct. at 597. In *United States v. Smith*, 516 F.3d 473, 478 (6th Cir. 2008), the court rejected this very argument that an upward variance resulting in a 72-month sentence was not justified because the offense of conviction (fraud) was nonviolent. The court found no abuse of discretion, observing that "[a]lthough a district court surely could credit these arguments in giving a lower sentence, we see no basis for saying it must do so." *Id.*

Robinson's "double counting" argument is no more persuasive. "[I]mpermissible 'double counting' occurs when precisely the same aspect of the defendant's conduct factors into his sentence in two separate ways." *United States v. Moon*, 513 F.3d 527, 542 (6th Cir. 2008) (quoting *United States v. Farrow*, 198 F.3d 179, 195 (6th Cir. 1999)). Where a defendant is penalized for "distinct aspects" of his conduct, no double counting will be found. *Id.* (citing *United States v. Eversole*, 487 F.3d 1024, 1030 (6th Cir. 2007)). Although there is some overlap in this case, the district court's explanation of its reasoning for upwardly departing *and* upwardly varying is sufficiently explicit to justify its imposition of a 72-month term of imprisonment.

The district court took pains to spell out its assessment of the true significance of Robinson's lengthy criminal history and offense conduct in evaluating such distinct aspects as likelihood of recidivism, need for punishment and deterrence, unlikelihood of rehabilitation, and need for

protection of society. The care with which the district court reasoned demonstrates that it did not engage in impermissible double-counting. Accordingly, the sentence has not been shown to be procedurally or substantively unreasonable and the district court has not been shown to have abused its discretion.

### III. CONCLUSION

For all the foregoing reasons, we reject all of defendant Robinson's assignments of error. The conviction and sentence are **AFFIRMED**.

**MERRITT, Circuit Judge, concurring.** I concur in the Court's opinion except with regard to the *Miranda-Doyle* violation. The prosecutor here clearly and deliberately disregarded her duty not to comment or refer to the defendant's exercise of his right to remain silent, and that in itself is a clear constitutional violation. *See, e.g., Wallen v. Fletcher*, 803 F.2d 722, 722 (6th Cir. 1986) (single comment by a police officer as to defendant's silence sufficient to establish a *Doyle* violation); *Meeks v. Havener*, 545 F.2d 9, 10 (6th Cir. 1976) (same); *Treesh v. Bagley*, No. 1:02 CV 462, 2007 WL 1039081 (N.D. Ohio Mar. 31, 2007) (same). The Court notes correctly that the prosecutor "appears to have done so deliberately." For this, I would reverse the conviction in the case were it at all close or in doubt. These violations should be deterred and strongly disapproved by the judiciary.

Here I am obligated to leave the conviction in place because the proof is overwhelming, and the government itself and the public may not be punished by its agent's deliberate constitutional violation. The constitutional violation meets the constitutional harmless error standard. *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993). My review of the record leads me to the conclusion that the verdict is clearly correct, and I have confidence that the jury would have reached the same result without the prosecutor's deliberate disregard for the law. The prosecutor should be reprimanded not only by the Court but by her employers in the Department of Justice — not with a wink and a smile but with a reprimand that this kind of deliberate prosecutorial misconduct will not be countenanced.

**CLAY, Circuit Judge, dissenting.** Because Defendant's counsel rendered ineffective assistance of counsel, I would vacate Defendant's conviction and remand for proceedings consistent with this opinion. Therefore, I respectfully dissent.

Although an ineffective assistance of counsel claim is ordinarily deferred until post-onviction proceedings under 28 U.S.C. § 2255, when an evidentiary hearing can be held to determine whether counsel's conduct was motivated by sound strategy, an ineffective assistance claim may be considered on direct review if the record is adequately developed to allow the court to assess the merits of the claim. *United States v. Watkins*, 509 F.3d 277, 283 (6th Cir. 2007). Here, Defendant's ineffective assistance claim relates only to whether counsel's closing argument was deficient on its face. Thus, the trial transcript provides the Court with an adequately developed record to enable review of Defendant's ineffective assistance claim. Based on that record, counsel's closing argument was so damaging to Defendant's credibility that it "fell below an objective standard of reasonableness" and prejudiced the defense. *Strickland v. Washington*, 466 U.S. 688, 687-88 (1984).

A defendant's right to effective assistance of counsel extends to closing arguments. *Yarborough v. Gentry*, 540 U.S. 1, 5, 124 S. Ct. 1, 157 L. Ed. 2d 1 (2003). However, "counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage." *Id.* at 5-6, 124 S. Ct. at 1. "Judicial review of a defense attorney's summation is therefore highly deferential-and doubly deferential when it is conducted through the lens of federal habeas." *Id.* at 6, 124 S. Ct. at 1.

In the instant case, defense counsel began his closing argument with the following statement:

> Following that presentation, I think it would be appropriate if I waved the white flag and just go sit down, because what could I possibly say about this case that she hasn't said? I hope none of you stayed up last night wondering about what the defense lawyer was going to say in his closing argument, because I didn't.
> Here's the way I do it. I stand up, and I start thinking about the evidence, and I say what comes to my mind. If it's a little disjointed, well, I'm sorry. Some of you people can follow it, and I hope I make it clear as I do it.

(Tr. at 394-95.)

In this statement, counsel plainly admitted that he did not think about his closing statement in advance; rather, he said whatever popped into his head when he stood up to make his argument. Because counsel is an officer of the court, this Court must take counsel at his word. Based on this admission, it is clear that his closing statement was not the result of any strategic or tactical decisionmaking. Thus, if his closing argument was damaging to the defense, the Court should not afford counsel the level of deference that it typically gives to decisions that are a matter of legitimate defense strategy.

> Later in his argument, defense counsel said the following:

> Now, he told a story of how this thing happened. It's a hard story to follow, but it's not impossible to believe. Did you ever hear about sky divers that jump out of planes and their chute doesn't open and they live? Would you believe that if someone told you, hey, a guy fell out of an airplane, landed on the ground and he didn't die. That's impossible.

> How about the lady in Cincinnati, had triplets back-to-back without medication. Think that happens every day? No, it happens once every nine million times. So no matter what someone tells you from the stand, it doesn't have to be a lie just because it's from a defendant. And it can be true, because other things about Mr. Robinson make sense.

(Tr. at 398.)

In this statement, Defendant's attorney equated the probability of Defendant's testimony being true to someone surviving jumping out of a plane without a parachute. Even reading this statements in the context of counsel's entire closing argument, in which he made a number of arguments in support of Defendant's version of events, defense counsel left the jury with the clear impression that he found Defendant's testimony to be virtually impossible to believe. Because the entire case turned on whether the jury believed the government or Defendant's version of events, defense counsel's conduct was so deficient, prejudicial and egregious that it "undermined the proper functioning of the adversarial process" such that "the trial cannot be relied upon as having produced a just result." *Strickland*, 466 U.S. at 686. Indeed, it is not an exaggeration to assert that Defendant's representation was so deficient as to reduce the trial proceeding to a sham. Therefore, Defendant's conviction should be vacated on the basis that his counsel provided ineffective assistance.