NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0618n.06

No. 13-5683

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| JOHN ROBINSON, | ) | **FILED**<br>Sep 01, 2015<br>DEBORAH S. HUNT, Clerk |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| UNITED STATES OF AMERICA, | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF KENTUCKY |
| Respondent-Appellee. | ) | |

Before: BOGGS and KETHLEDGE, Circuit Judges; and HELMICK, District Judge. [*]

KETHLEDGE, Circuit Judge. John Robinson appeals the denial of his petition for habeas relief under 28 U.S.C. § 2255, arguing that his attorney was constitutionally ineffective during his trial for bank burglary. We affirm.

I.

At 2 A.M. on September 10, 2007, the alarm went off at the Fifth Third Bank in Erlanger, Kentucky. R. 91 at 509-10. A burglar had drilled through the lock on the night-deposit box, leaving behind pieces of the lock, duct tape, and white dust. R. 98 at 981, 989-90. Sergeant Steve Dickerson was the first to arrive at the scene. He pulled into the bank's exit and saw a black man dressed in black clothes with white shoes and white gloves. The man was walking away from the rear of the bank; after he saw the police car, he began to run. Dickerson chased him through a field but lost track of him in the darkness. R. 91 at 510-11, 515-16.

---

[*] The Honorable Jeffrey J. Helmick, United States District Judge for the Northern District of Ohio, sitting by designation.

Shortly thereafter, Deputy Jeff Ruber arrived with a police dog named Norton. After Ruber and Norton spent a fruitless hour trying to find the suspect, the police brought in a new dog named Sombie, who sniffed the field and located a bag of tools, including a drill, a grinder covered in white dust, a hydraulic jack, and a dowel rod with fish hooks taped onto it. R. 98 at 985-94.

Around 4 A.M., the police department received a call from Eugene Harris, a resident of an apartment complex located next to the bank. Harris said he had just seen a suspicious-looking man standing next to a black car parked in the complex. R. 98 at 1042-44. Officer David Lillich and Sombie responded to the call. Lillich sent Sombie to search a garbage area near the complex, but kept the dog on a leash. Sombie ran into the garbage area; a black man ran out. Lillich said "[s]top, police, or I'll send my dog." R. 98 at 906. The man paused for a moment, looked back at Sombie, and took off running again. Lillich then unleashed the dog. Sombie quickly ran down the suspect, who turned out to be Robinson. *Id*. The police searched the area where Robinson had been hiding and found a pair of white gloves, white shoes, dark clothing, a flashlight, and a ski mask. R. 98 at 942-44.

The police obtained a warrant to search a black Lincoln Continental parked near where Robinson had been hiding. Therein they found a number of incriminating items, including maps of the area, driving directions to local banks, mail with Robinson's name on it, an index card with the name and phone number of a locksmith, a bank-deposit bag with 100-dollar bills, a police scanner, and a large tool box containing "an enormous variety of tools," including sledgehammers, a hydraulic jack, dowel rods, bolt cutters, a pry bar, hammers, pliers, fish hooks, and a "snake type device for looking [underneath] doors." R. 98 at 1003-11.

Robinson was indicted for attempted bank burglary, in violation of 18 U.S.C. § 2113(a). He moved to suppress the evidence that the police had recovered from closed containers in the Lincoln. The district court denied that motion. After a trial, the jury convicted Robinson. He appealed to this court, and a divided panel affirmed. *United States v. Robinson*, 357 F. App'x 677 (6th Cir. 2009).

Robinson later filed a habeas petition pursuant to 28 U.S.C. § 2255, arguing among other things that his attorney had provided constitutionally ineffective assistance of counsel. The district court denied the petition. This appeal followed.

II.

We review de novo the district court's decision denying Robinson's habeas petition. *Mapes v. Tate*, 388 F.3d 187, 190 (6th Cir. 2004).

A.

Robinson argues that defense counsel provided ineffective assistance when he failed to challenge the search of the entire Lincoln (rather than just the containers found therein, whose search counsel did challenge). To obtain habeas relief, Robinson must first show that his lawyer could have successfully challenged the search, *i.e.*, that the police violated the Fourth Amendment when they searched the Lincoln. *See Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986).

The officers had a warrant to search the Lincoln, but the government now concedes that the warrant was invalid. Police officers may lawfully search a car even without a warrant, however, if they have probable cause to believe that the car contains evidence of a crime. *Pennsylvania v. Labron*, 518 U.S. 938 (1996) (per curiam); *Michigan v. Thomas*, 458 U.S. 259, 261 (1982) (per curiam). "Probable cause exists when there is a fair probability that contraband

or evidence of a crime will be found in a particular place." *United States v. Lumpkin*, 159 F.3d 983, 986 (6th Cir. 1998) (internal quotation marks omitted).

To determine whether the police had probable cause, we examine all the "facts known to the officers at the time of the search." *Smith v. Thornburg*, 136 F.3d 1070, 1075 (6th Cir. 1998). Here, the police received the phone call from Harris, the eyewitness who lived in the apartment complex located next to the bank, two hours after the burglary. Harris said that he had seen a suspicious-looking man near a large black car, specifically "a big Ford or a [Lincoln] Continental." R. 98 at 1042. The police had "shut down" the only entrance or exit to the complex almost immediately after the burglary, so they knew that the car Harris had seen must have arrived in the complex either before the burglary or soon after. R. 91 at 512; R. 98 at 965-66, 973, 1110-11. Harris also told the police that the suspicious man had driven off in the car "as if he didn't know where he was going" and that he had "hurriedly made a left turn" down a dead-end road that led toward the back of the complex. R. 98 at 1043-45.

When the police responded to Harris's call, they found a car matching the exact description and location that Harris had provided: a large black Lincoln Continental parked near the back of the complex. The Lincoln had Louisville license plates and its hood was still warm, suggesting that its driver did not live in the area but nevertheless had been driving around the blockaded complex in the middle of the night. The Lincoln was parked 100 feet from where the police found Robinson. And in the place where Robinson had been hiding, the police found a pile of clothes matching those seen on the burglar.

Given these facts, the police had reason to believe that the man who had broken into the bank that night had also driven the Lincoln after the burglary. Thus, the police had probable cause to believe that the car would contain evidence of a crime—namely bank burglary. That

means the police searched it lawfully, even if the warrant itself did not state all the reasons why. *See Lumpkin*, 159 F.3d at 986. Robinson's lawyer therefore did not render ineffective assistance by failing to challenge the search.

B.

Robinson next argues that his lawyer provided constitutionally ineffective assistance by failing to object on two occasions at trial. First, Robinson contends that his lawyer should have objected when the government elicited testimony that Robinson had refused to speak to the police while in custody. Prosecutors may not ask witnesses whether a defendant remained silent after the police read him his *Miranda* rights. *United States v. Tarwater*, 308 F.3d 494, 511 (6th Cir. 2002). But "experienced [defense] counsel learn that object[ing] to each potentially objectionable event could actually act to their [client's] detriment." *Lundgren v. Mitchell*, 440 F.3d 754, 774 (6th Cir. 2006).

During trial, the government asked two officers whether they tried to interview Robinson after they arrested him. The officers responded that Robinson refused to speak with them. R. 98 at 952-53, 996. Although the government should not have asked those questions, *Tarwater*, 308 F.3d at 511, the officers mentioned only in passing that Robinson had not wanted to talk. And if defense counsel had objected at that point, the court then would have needed to instruct the jurors to forget about Robinson's post-*Miranda* silence—which might have only helped them remember it. *See United States v. Caver*, 470 F.3d 220, 244 (6th Cir. 2006). Robinson's lawyer thus faced a choice: say nothing and hope the jury missed the passing reference, or object and thereby risk that the instructional cure would be worse than the disease. Counsel's decision not to object was thus a permissible tactical judgment.

Second, Robinson contends that his lawyer should have objected when the government asked Robinson if he knew of any "reason why [the arresting] officers would come in here and lie." R. 98 at 1121. But too-frequent objections quickly annoy both judges and juries—especially when those objections are overruled—thus experienced trial counsel "use objections in a tactical manner." *Lundgren*, 440 F.3d at 774. And the district court might well have overruled any objection to the government's line of questioning, since we have "not directly addressed the propriety of asking a defendant whether other witnesses are lying," *Arnold v. Wilder*, 657 F.3d 353, 367 (6th Cir. 2011) (internal quotation marks omitted). Thus, defense counsel's decision not to object was not objectively unreasonable. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).

Moreover, Robinson must show more than just deficient performance; he must also show a reasonable probability that, if his attorney had objected, the jury would have acquitted him. *Strickland*, 466 U.S. at 696. Here, the evidence against Robinson was "overwhelming." *United States v. Robinson*, 357 F. App'x at 691 (Merritt, J., concurring). At trial, the government offered evidence that Robinson was hiding near the bank on the night of the burglary; that next to him were a flashlight, a ski mask, and a set of clothes matching those seen on the burglar; and that he fled the police when they discovered his hiding spot. The government also offered the evidence found in the Lincoln: namely, driving directions to Fifth Third banks, a calling card for a locksmith, a bank deposit bag with hundred-dollar bills, and an enormous number of burglary tools, many of which matched those the police found in the field near the bank. Thus, Robinson cannot show that his lawyer's failure to object to the government's questions prejudiced his case.

C.

Robinson next argues that his lawyer was constitutionally ineffective during closing arguments. "[C]ounsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage." *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003).

Here, Robinson's attorney made the following statement during his summation:

Following that presentation [from the government during its closing], I think it would be appropriate if I waved the white flag and just go sit down, because what could I possibly say about this case that [the government] hasn't said?

R. 93 at 823-24. That does seem like a curious thing for a defense attorney to say during closing arguments. The rest of the transcript, however, reveals that Robinson's attorney was merely admitting that the government's case was strong—which it was—in hopes that his candor would earn him credibility with the jury. His real argument was essentially as follows: yes, it would be strange if Robinson was not the real bank robber, but stranger things have happened. R. 93 at 827.

Given the strength of the government's case, that argument was at least constitutionally permissible. It was certainly a hook-and-ladder play run from Robinson's own end zone, but that field position was the result of the government's evidence, not his attorney's errors. And it is hard to imagine what else his attorney could have argued. Moreover, Robinson's attorney in no way conceded that his client was guilty: counsel argued that the true burglar would not have chosen to hide so close to the bank, that Robinson probably arrived at the complex after the burglary occurred, and that Robinson lacked a motive to rob the bank because he was a successful businessman. R. 93 at 828, 833. Counsel thus made a reasonable strategic decision

when he admitted the strength of the government's case and then argued that there was reasonable doubt nonetheless.

Robinson responds that counsel also told the jury that he had not prepared his closing arguments at all—that he would "just say what comes to [his] mind." R. 93 at 824. In Robinson's view, that means counsel's summation could not have been the result of a reasonable strategic decision. But some lawyers believe that juries respond better to extemporaneous arguments. And some lawyers sandbag about just how much or how little they have prepared, perhaps in hopes that the jury will find their arguments more sincere. Counsel's summation, when read beginning to end, is fairly sophisticated; it seems unlikely that he truly winged it. In any event, that counsel told the jury that he was speaking off-the-cuff does not show constitutionally ineffective assistance.

Moreover, given the evidence that the government presented, even a better summation probably would not have persuaded the jury to acquit. Robinson therefore cannot show prejudice. For both of these reasons, Robinson is not entitled to habeas relief on the basis of his lawyer's closing arguments.

D.

Finally, Robinson argues that he was prejudiced by the combined effect of his lawyer's three purported errors: his failure to challenge the search, his failure to object to the government's questioning, and his unusual closing arguments. To obtain habeas relief, however, Robinson must show that at least one of those purported errors rose to the level of constitutionally deficient performance. *See Strickland*, 466 U.S. at 687. As demonstrated above, Robinson has not shown that. So this argument fails.

The judgment of the district court is affirmed.

**HELMICK, District Judge, concurring in the judgment.** Although I agree with the majority's thorough probable-cause analysis and its conclusion that the district court's denial of Robinson's § 2255 motion should be affirmed, I write separately to express my disagreement with the Court's analysis of *Strickland*'s deficient-performance prong.

An affidavit offered in support of a search warrant application must be supported by probable cause and must "indicate why evidence of illegal activity will be found 'in a particular place.'" *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004). The affidavit filed in support of the warrant to search the Lincoln stated, in its entirety, that

> on September 10, 2007[,] the Erlanger Police arrested John A. Robinson after he attempted to break into a night deposit box at the 5/3 Bank in Erlanger, KY. Mr. Robinson was using a drill, a grinder and other advanced burglary techniques during this crime. Mr. Robinson fled the area and was captured by K9 after the incident. Mr. Robinson is suspected in 17 related bank burglaries.

(R. 18-2 at 4). As the district court noted, the affidavit "did not tie [Robinson] to the Lincoln in any way, or explain the Lincoln's significance at all. It failed to describe where the Lincoln was found, who owned it, or why police believed that the fruits or instrumentalities of crime would be found inside it." *United States v. Robinson*, 2013 WL 1878915, at *6 (E.D. Ky. May 3, 2013). Moreover, the warrant affidavit was grossly misleading, given its failure to acknowledge no one witnessed Robinson use any of those tools and techniques, or that officers spent over two hours, with two police canines, searching the area around the bank before apprehending Robinson. Despite these facial deficiencies, Robinson's attorney failed to challenge the search warrant's validity due to an erroneous legal understanding of Robinson's standing to assert a right to privacy in the vehicle. *Id.* at *8; *see also Mancusi v. DeForte*, 392 U.S. 364, 368 (1968). Unfortunately, this is not the last time the specter of the "overwhelming" evidence against

Robinson would result in the violation of his constitutional rights. *See United States v. Robinson*, 357 F. App'x 677, 691 (6th Cir. 2009) (Merritt, J., concurring).

Robinson also challenges his trial counsel's failure to object to the prosecutor's questions about Robinson's post-*Miranda* silence and questions in which the prosecutor pushed Robinson to explain why the police officers would testify falsely in order to implicate him in the bank burglary. The majority only reluctantly acknowledges these questions were plainly inappropriate. The trial transcript contains no less than four references to Robinson's post-*Miranda* silence during the testimony of two police officers.

The prosecutor first questioned Lieutenant Gilpin:

Q:      So what happened when you attempted to interview [Robinson]?

A:      The first thing I did, since he was in custody, I wanted to make sure he was aware of what his rights were, commonly referred to as Miranda rights. . . . The very first one states I have a right to remain silent. Once I read that to him, I asked him if he understood that. He acknowledged that he did, and basically he said he did not want to talk. At that point, I terminated reading him his rights, put my initials behind the first one to show that I did read that first sentence to him. . . . .

. . .

Q:      . . . What did you do next?

A:      A little bit after 8:00 that morning, Detective Aylor was back at the office. I knew he knew a little bit more about what happened at the bank, because I never made it to the bank itself. So I thought Detective Aylor and I would approach him, try to interview him again. . . . Set another rights waiver in front of him. It's a copy of what I originally did earlier. Read him the first one again that he had the right to remain silent. He basically stated he did not want to talk. . . .

R. 98 at 56-57. It is inconceivable that the prosecutor did not know the answer to her questions. Certainly, Lieutenant Gilpin's first impermissible reference to Robinson's post-*Miranda* silence should have caused the prosecutor to be more cautious moving forward, even if defense counsel decided not to object. The majority's contention that defense counsel's failure to object was "a permissible tactical judgment" loses its credibility with the prosecutor's next question.

Q:      Did the defendant make any statements during either one of those interviews?

A:      No.

R. 98 at 57.  At this point, defense counsel could not reasonably have thought the jury would have missed the government's improper references to his client's post-arrest silence.  He needed to act.

The government's misconduct did not end there.  The prosecutor subsequently put Detective Aylor on the witness stand and asked him if Robinson "ma[d]e any statements to [the officer]."  R. 98 at 99.  It would be unreasonable to expect Detective Aylor's response to be any different than Lieutenant Gilpin's.  Without question, "[t]he prosecutor here clearly and deliberately disregarded her duty not to comment [on] or refer to the defendant's exercise of his right to remain silent, and that in itself is a clear constitutional violation."  *Robinson*, 357 F. App'x at 691 (Merritt, J., concurring) (citing *Wallen v. Fletcher*, 803 F.2d 722, 722 (6th Cir. 1986)).  While it is difficult to imagine a circumstance in which a trial judge would be annoyed by meritorious objections – perhaps annoyed at the attorney asking impermissible questions but hardly annoyed at the attorney who properly and timely objected to those impermissible questions – defense counsel plainly made the wrong decision in choosing between protecting his client's constitutional rights against repeated governmental misconduct and potentially annoying the jury.

During her cross-examination of Robinson, the prosecutor questioned Robinson on discrepancies between his testimony concerning his conduct on the night of the bank burglary and the testimony of law enforcement officers.  The prosecutor twice asked Robinson to explain to the jury "why these officers would come in here and lie . . . and make up these stories about [Robinson] . . . ."  R. 98 at 224.  This Court previously has held "asking a defendant whether other witnesses are lying . . . [is] improper."  *United States v. Dickens*, 438 F. App'x 364, 370

(6th Cir. 2011). While we cannot be certain whether the trial court would have sustained or overruled a defense objection to the prosecutor's questions about the officers' potential motivation for lying in 2007, we know the district court concluded in ruling on Robinson's § 2255 motion that "defense counsel's failure to object to these questions was objectively unreasonable and constituted deficient performance." *Robinson*, 2013 WL 1878915, at *13.

The prosecutor's questions, and the responses those questions elicited, were not "passing references" as the majority suggests; instead, they appear to be part of a calculated and concerted effort to prepare the jury to disbelieve Robinson's colorful explanation for his presence in the Erlanger Lakes parking lot. I cannot agree with the proposition that defense counsel's failure to object to any of these six instances of prosecutorial misconduct "might be considered sound trial strategy," particularly in light of the fact defense counsel likely knew he could rely only on Robinson's account and principles of reasonable doubt during his closing argument. *Strickland v. Washington*, 466 U.S. 668, 689 (1984) (citation omitted).

I concede that the record contains sufficient evidence to establish probable cause for the search of the Lincoln as well as to support the jury's guilty verdict at the close of the case, and therefore Robinson is not entitled to habeas relief because he cannot establish the prejudice necessary to prevail on his ineffective-assistance-of-counsel claims. *Id.* at 696. I am deeply troubled, however, by the apparent willingness of so many of the actors involved in the police investigation and the judicial proceedings to cut corners – to treat this case as one which demanded far less than their full attention and best efforts. Robinson's constitutional rights deserve far greater protection than they received.