RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 08a0079p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

    *Plaintiff-Appellee,*

  *v.*

KIMBERLY SUE SMITH,

    *Defendant-Appellant.*

No. 06-1218

Appeal from the United States District Court
for the Western District of Michigan at Marquette.
No. 04-00022—R. Allan Edgar, District Judge.

Argued: February 5, 2008

Decided and Filed: February 19, 2008

Before: MARTIN and SUTTON, Circuit Judges; OBERDORFER, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Lucian J. Bernard, PEARSON & BERNARD, Covington, Kentucky, for Appellant. Jennifer L. McManus, ASSISTANT UNITED STATES ATTORNEY, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Lucian J. Bernard, PEARSON & BERNARD, Covington, Kentucky, for Appellant. Maarten Vermaat, ASSISTANT UNITED STATES ATTORNEY, Marquette, Michigan, for Appellee.

_____

## OPINION

_____

  SUTTON, Circuit Judge. Kimberly Smith challenges her 72-month sentence, which arose from a series of frauds she committed while leading an American Red Cross chapter in the months after September 11th. We affirm.

_____

[*] The Honorable Louis F. Oberdorfer, Senior United States District Judge for the District of Columbia, sitting by designation.

I.

On September 10, 2001, Kimberly Smith, using a fake name and fake credentials, landed a job as the executive director for the Western Upper Peninsula Chapter of the American Red Cross. The next day of course was September 11th, and the National Red Cross responded to the tragedy in a variety of ways. One initiative, the Liberty Fund, allowed donors to earmark contributions to the victims of the attack. The National Red Cross required Smith's chapter—and Smith as its executive director—to designate certain donations as "Liberty Funds" and to remit the funds to support the National Red Cross relief effort. The chapter, not surprisingly, took in a large number of contributions soon after September 11th, accepting donations in one month that totaled more than its average yearly receipts.

Instead of forwarding the Liberty Fund donations to the National Red Cross, Smith had other plans. She used the donations and other money from the chapter's bank accounts to "support[] her drug and alcohol habits," to pay for a personal vacation and to buy furniture, jewelry, electronics and a tractor/snowblower.

To hide the embezzlement, Smith made a series of false statements about the chapter's finances and allowed the chapter records to fall into disarray. In late October and early November, Smith told the chapter's accounting consultant that her services were no longer needed, and Smith stopped categorizing donations and recording financial transactions. Smith repeatedly lied to her board of directors about the financial condition of the chapter and forwarded false financial reports to the National Red Cross to stave off an investigation. When that did not work, she told the national organization she had forwarded Liberty Fund money to it when she had not. When the chapter finally sent a Liberty Fund check to the National Red Cross for $2,961 on September 4, 2002, the check bounced for insufficient funds. In an attempt to disguise the chapter's lack of funds, Smith applied for a $30,000 loan, misrepresenting the chapter's rights in two boats she offered as collateral. At some point, Smith returned to the chapter a small amount of the money she had stolen ($26,158), but the record does not show whether she did so before the criminal investigation began.

Prior to Smith's tenure as executive director, the chapter had been solvent, had maintained proper books and records and had more than 280 regular volunteers. Immediately after September 11th, the chapter received substantial donations and benefitted from an outpouring of community support. During Smith's tenure, however, the chapter stopped performing its basic disaster-relief efforts, and by the end of 2002, the chapter was $157,000 in debt—a decline in net worth of approximately $250,000. As a result of Smith's theft, the public lost confidence in the chapter, and community support dried up. In 2001, the chapter received $34,000 in local donations; that number dropped to $6,000 in 2003; and it increased marginally to $8,400 in 2005. At one point, the chapter had zero volunteers remaining, and four years after Smith left the organization it had only 90 volunteers, approximately one-third the number before her ill-founded hiring.

A federal grand jury indicted Smith for wire fraud, *see* 18 U.S.C. § 1343, and for making a false statement on a loan application, *see id.* § 1014. Not yet prepared to take on the challenges of rehabilitation, Smith committed identity theft while out on bond, using another individual's credit card number and personal information to run up $10,856 in charges. She later attempted, unsuccessfully, to draw an additional $12,488 from the account.

In exchange for the government's agreement to drop one of the four wire-fraud counts and to refrain from prosecuting Smith for identity theft, she pleaded guilty to the remaining charges. As part of the plea agreement, Smith admitted to most of the facts surrounding her economic crime spree.

At sentencing, the court found an intended loss of $345,598. It gave Smith an offense level of 21 and a criminal history of II, yielding a guidelines range of 41 to 51 months. In addition to the advisory guidelines range, the court considered the other § 3553(a) factors and decided that the guidelines did not reflect the seriousness of Smith's crimes. Because Smith had cooperated in the investigation of these crimes and those committed by others as well, the court "ameliorated to some extent the sentence which [it] would otherwise have applied" but still determined that an above-guidelines, 72-month sentence was appropriate.

II.

When reviewing sentences on appeal, we "first ensure that the district court committed no significant procedural error" and "then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard." *Gall v. United States*, 128 S. Ct. 586, 597 (2007).

A.

Smith's passing contention that the court's findings of fact at sentencing run afoul of *Booker* gets no traction. As we have said before, *Booker* does not bar judicial factfinding so long as the sentencing court appreciates that the guidelines are advisory. *See United States v. Mickens*, 453 F.3d 668, 673 (6th Cir. 2006).

B.

Smith next argues that two of the guidelines enhancements turn on impermissible double counting. By enhancing her offense level for "abus[ing] a position of public or private trust," U.S.S.G. § 3B1.3, and for misrepresenting that her actions were "on behalf of a charitable . . . organization," *id.* § 2B1.1(b)(8)(A), the court, says Smith, punished her twice for the same conduct. True, sentencing courts err when "precisely the same aspect of a defendant's conduct factors into his sentence in two separate ways." *United States v. Farrow*, 198 F.3d 179, 193 (6th Cir. 1999). True also, the sentencing commission has disclaimed any interest in serially punishing defendants for abusing a position of trust. *See* U.S.S.G. § 3B1.3 (stating that the adjustment "may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic").

But in this instance the two enhancements "penalize distinct aspects of [Smith's] conduct" and distinct harms. *United States v. Eversole*, 487 F.3d 1024, 1030 (6th Cir. 2007) (internal quotation marks omitted). The abuse-of-trust enhancement accounts for Smith's exploitation of her position as executive director, while the misrepresentation enhancement accounts for Smith's deceptions in misleading contributors that their donations would go to charitable purposes rather than her own. Smith's conduct "harmed the charity, thus meriting an abuse-of-trust enhancement, as well [as] the charity's donors, warranting a separate enhancement for misrepresentation of a charity." *United States v. Walker*, 490 F.3d 1282, 1301 (11th Cir. 2007); *cf. United States v. Dobish*, 102 F.3d 760, 762 (6th Cir. 1996) (per curiam) (holding that vulnerable-victim and abuse-of-trust enhancements did not amount to double counting because one "focuses on the choice of victims" and the other "focuses on the offender's post-selection conduct").

Applying the abuse-of-trust enhancement to an embezzling bank executive, we have reasoned, permissibly accounts for the greater culpability of a bank executive than, say, an ordinary bank teller. *See United States v. Humphrey*, 279 F.3d 372, 379–81 (6th Cir. 2002); *see also United States v. Brown*, 66 F.3d 124, 129 (6th Cir. 1995) (holding that "abuse of trust [is not] a necessary element of the crime of embezzlement"). So too here, the two enhancements capture the difference in culpability between a fraud committed by an ordinary Red Cross volunteer and one committed by Smith, who not only misled the public by soliciting donations to line her own purse but also took advantage of her position as head of the Red Cross chapter to further the fraud and postpone its

discovery. In the final analysis, it is not double counting, but single counting, to punish a defendant twice for distinct aggravating qualities of her offense.

In reaching this conclusion, we agree with the three other federal circuits that have considered, and rejected, similar arguments arising from defalcations by leaders of charitable organizations. *See United States v. Thornton*, 511 F.3d 1221, 1228 (9th Cir. 2008) ("Thornton not only represented that he was working on behalf of a charitable foundation and thereby encouraged contribution from members of the public, he also abused the authority [the university] entrusted in him as the president of the foundation to facilitate the commission and concealment of his fraud."); *Walker*, 490 F.3d at 1301 ("Walker's conduct harmed the charity, thus meriting an abuse-of-trust enhancement, as well as the charity's donors, warranting a separate enhancement for misrepresentation of a charity."); *United States v. Arnaout*, 431 F.3d 994, 1000 (7th Cir. 2005).

Smith next argues that the court erred in forcing the government to choose between making a motion for a downward departure (because Smith cooperated in the investigation and indeed identified criminal acts by other individuals) and a motion for an upward departure (because the advisory guidelines sentence did not reflect the seriousness of the crime). We disagree. It is no doubt true that most defendants will have aggravating and mitigating circumstances that add some weight to both sides of the sentencing scales, and many defendants' guidelines calculations will have enhancements and downward adjustments that cancel each other out. But at the end of every sentencing hearing, a court still must impose one of three sentences—a within-guidelines, a below-guidelines or an above-guidelines sentence. *See United States v. Harotunian*, 920 F.2d 1040, 1043 (1st Cir. 1990) ("Whether or not circumstances exist that might support departures in both directions, it is indisputable that . . . in any given sentencing, there can be at most one departure, up or down—a phenomenon determined by the net result of all interim calculations."). The government's initial attempt to move for an upward *and* a downward departure asked the court to do what it could not. It thus was hardly error for the court to tell the government to make a choice.

Nor, at any rate, did Smith suffer from the choice. The district court listened to the government's argument that Smith's cooperation should alleviate her sentence; it recognized that it had the authority to sentence below the guidelines "by virtue of a departure"; and it accounted for her cooperation in minimizing the extent of her upward variance.

C.

In reviewing a challenge to the length of an outside-guidelines sentence, we may "take the degree of variance into account and consider the extent of a deviation from the Guidelines." *Gall*, 128 S. Ct. at 595. But in applying abuse-of-discretion review, we "must give due deference to the district court's decision that the § 3553(a) factors . . . justify the extent of the variance." *Id.* at 597; *see also United States v. Grossman*, No. 06-2310, ___ F.3d ___, 2008 WL 160612, at *3 (6th Cir. Jan. 18, 2008).

After considering the guidelines range (41–51 months), the court considered the other § 3553(a) factors and found that the range did not adequately account for Smith's culpability, *i.e.*, the seriousness of her offense. *See* 18 U.S.C. § 3553(a)(2)(A). Smith's fraud was worse than the run-of-the-mine case because she committed it "during a time when money was being given to alleviate the suffering caused by the 9/11 attacks." The guidelines range understated the financial harm to the chapter both because "the defendant obfuscated some of the facts as a result of . . . her manipulation of the records" and because of the "damage done . . . to [the chapter's] credibility . . . in a particular time of need." And "there were many other victims [of Smith's fraud], even though they may not be identifiable," and the victims of "future natural disasters probably will not receive help that they would otherwise receive from contributions."

The court added that Smith's characteristics, *see id.* § 3553(a)(1), and the need for deterrence, *see id.* § 3553(a)(2)(B), justified a strict sentence given Smith's "previous record of fraudulent conduct" and her "additional fraudulent conduct" committed "when released on bond." Seeking to deter others, the court thought that "[t]he word should go out that if you blatantly steal from a public charity . . . the results can be severe." The court considered Smith's cooperation and "ameliorated to some extent the sentence which [it] would otherwise have applied" but still arrived at the judgment that an above-guidelines sentence was necessary. In view of the deference we owe the district court's assessment that the § 3553(a) factors "justify the extent of the variance," *Gall*, 128 S. Ct. at 597; *see also Grossman*, 2008 WL 160612, at *3–4, we conclude that the district court could reasonably determine that a 72-month sentence was appropriate on this record.

Smith says she deserved a lower sentence because fraud is not a violent crime, because she acted only to support her drug and alcohol habits (rather than out of a desire to harm the Red Cross) and because she has never been in prison (and therefore could be deterred with a lesser sentence). Although a district court surely could credit these arguments in giving a lower sentence, we see no basis for saying it must do so. No abuse of discretion thus occurred.

Smith also claims that the court improperly "gave a heavier weight to extran[e]ous factors outside of 18 U.S.C. 35[5]3(a)." As she sees it, the court erred by enhancing her sentence based on the fact that the stolen money was intended to benefit the September 11th victims. The vulnerability of the 9/11 victims, however, enabled the misbegotten fundraising that facilitated Smith's crime. Far from being an extraneous factor, the setting of this crime strikes us as an eminently sensible consideration in weighing the "nature" and the "seriousness of the offense." 18 U.S.C. § 3553(a)(1), (a)(2)(A).

III.

For these reasons, we affirm.