RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0029p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JAMES STEVEN ROBINSON (14-6164 and 14-6165);
RUTH THOMASINE ROBINSON (14-6541); JAMES
ROBINSON (14-6542),

*Defendants-Appellants.*

Nos. 14-6164/6165/6541/6542

Appeal from the United States District Court
for the Eastern District of Kentucky at Pikeville.
No. 7:13-cr-00026—Amul R. Thapar, District Judge.

Decided and Filed: February 8, 2016

Before: MERRITT, BATCHELDER, and DONALD, Circuit Judges.

_____

### COUNSEL

**ON BRIEF:** Zenaida R. Lockard, OFFICE OF THE FEDERAL PUBLIC DEFENDER,
Cincinnati, Ohio, for Appellant in 14-6164 and 14-6165. Stephen W. Owens, Pikeville,
Kentucky, for Appellant in 14-6541. Melissa M. Salinas, OFFICE OF THE FEDERAL PUBLIC
DEFENDER, Toledo, Ohio, Dennis G. Terez, OFFICE OF THE FEDERAL PUBLIC
DEFENDER, Cleveland, Ohio, for Appellant in 14-6542. Charles P. Wisdom, Jr., Andrew T.
Boone, UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee.

_____

### OPINION

_____

MERRITT, Circuit Judge. In these cases we decide multiple appeals of criminal
convictions and sentences relating to the 2012 mayoral election in Martin, Kentucky.

1

In that election, incumbent Mayor Ruth Thomasine Robinson ("Thomasine Robinson"), her husband James Robinson, and his son James Steven Robinson ("Steven Robinson") allegedly attempted to secure Thomasine Robinson's reelection by coercing and bribing voters to vote for her. After a three-day jury trial, all three defendants were convicted of vote buying under 42 U.S.C. § 1973i(c) (now 52 U.S.C. § 10307(c)), and Thomasine Robinson and Steven Robinson were convicted of conspiracy to violate civil rights under 18 U.S.C. § 241. The jury also found James Robinson guilty of conspiracy to violate civil rights under 18 U.S.C. § 241, but the district court subsequently granted James Robinson's motion for acquittal under Federal Rule of Criminal Procedure 29 on that charge.

Thomasine Robinson now argues that there was insufficient evidence to support either of her convictions, and that the district court therefore erred in denying her motion for a judgment of acquittal under Federal Rule of Criminal Procedure 29. Steven Robinson likewise argues that his conviction for conspiracy to violate civil rights should be vacated because it is not supported by sufficient evidence. He also argues that the district court improperly imposed a requirement that he abstain from alcohol use as a term of his supervised release. Finally, James Robinson argues that the district court improperly reserved its ruling on his Rule 29 motion for acquittal, that the district court improperly applied enhancements to his sentence, and that his sentence is substantively unreasonable.

Upon considering each issue in turn, we **AFFIRM** the judgements of the district court.

## I. Facts and Procedural History

In November 2012, Mayor Thomasine Robinson of Martin, Kentucky, sought reelection. Martin would choose its mayor in the general election of November 6, where statewide and national offices were also on the ballot. A tight race was expected between Thomasine Robinson and Sam Howell, her challenger (Howell would ultimately win by only three votes). After the election, James Robinson physically confronted Sam Howell and threatened to kill him before he could take office; he was later convicted in Kentucky state court of terroristic threatening and menacing.

According to the allegations of the United States, Thomasine Robinson and her associates turned to illegal tactics in an attempt to secure votes for her reelection. Specifically at issue here are the alleged efforts of Thomasine Robinson, her husband James Robinson, and his son Steven Robinson (Thomasine Robinson's step-son) to deliver votes through a campaign of bribery, coercion, and intimidation.

The United States produced many witnesses to testify to these efforts. Some of the relevant testimony indicated that: Thomasine Robinson gave Ruby Wallen $20 to vote for her in the election; that Thomasine Robinson, with the cooperation of Ginger Stumbo, coerced and threatened voters to get them to vote for her by absentee ballot; that Steven Robinson, with the cooperation of Henry Mullins, attempted to intimidate and coerce Robert Clay to vote for Thomasine; that James Robinson gave Ashley Hale $10 to vote for Thomasine; and that James Robinson gave Henry Mullins money with which to purchase votes for Thomasine.

James Robinson moved for acquittal under Federal Rule of Criminal Procedure 29 at the close of the government's case, and at the close of all evidence, but the district court reserved the motion both times. The jury returned a guilty verdict on both the conspiracy and vote-buying charges, but the district court then granted James Robinson's Rule 29 motion as to the conspiracy charge. Thomasine Robinson was found guilty of vote-buying and conspiracy to violate civil rights, and Steven Robinson was found guilty of conspiracy to violate civil rights and two counts of vote-buying, but acquitted of a third count of vote-buying.

At sentencing, the district court assessed a leadership enhancement to James Robinson for directing Henry Mullins to help purchase votes and providing him with cash to do so, and an obstruction of justice enhancement for behaving menacingly toward federal employees during a trial recess. The district court then sentenced him to an above-guidelines sentence of 40 months in prison. Steven Robinson was sentenced to 21 months in prison and three years of supervised release. As a special condition of his supervised release, he was required to abstain from the consumption of alcohol. Thomasine Robinson was sentenced to 33 months in prison.

These appeals followed.

## II.  Discussion

### A.  Thomasine Robinson

Thomasine Robinson argues that there was insufficient evidence to support her convictions for conspiracy to violate civil rights under 18 U.S.C. § 241 and vote buying under 42 U.S.C. § 1973i(c) (now 52 U.S.C. § 10307(c)).

We review a challenge to the sufficiency of the evidence supporting a criminal conviction *de novo*.  *United States v. Fisher*, 648 F.3d 442, 450 (6th Cir. 2011) (citations omitted). However, a sufficiency of the evidence challenge places a "very heavy burden" on the defendants-appellants: they must show that "after viewing the evidence in the light most favorable to the prosecution, [no] reasonable trier of could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Sease*, 659 F.3d 519, 523 (6th Cir. 2011) (citations and internal quotation marks omitted).

1.

In order to support a conviction for vote buying, the prosecution needed only to offer evidence that Thomasine Robinson paid or offered to pay for a vote in an election "held solely or in part for the purpose of selecting or electing any candidate" for federal office.  52 U.S.C. § 10307(c).

It is undisputed that the 2012 election at issue included the election of candidates for federal office, including the President of the United States, so it was a covered election under the federal vote-buying statute.  Ruby Wallen testified that Thomasine Robinson gave her $20 to vote in the 2012 election.  Wallen's testimony was sufficient evidence upon which the jury could have found Thomasine Robinson guilty of vote buying beyond a reasonable doubt.  Thomasine Robinson's contention that her vote-buying conviction was not supported by sufficient evidence fails.

2.

Under federal law it is unlawful to "conspire to injure, oppress, threaten, or intimidate any person . . . in the free exercise or enjoyment of [voting rights], or because of his having so

exercised the same." 18 U.S.C. § 241. This statutory proscription of conspiracy to violate civil rights prohibits interference with a voter's right to cast a ballot for his or her preferred candidate, *United States v. Classic*, 313 U.S. 299, 309-15 (1941) (discussing an earlier codification of the statute at 18 U.S.C. § 51), and prohibits interference with the right of voters to have their votes free from dilution by unlawfully procured votes, *Anderson v. United States*, 417 U.S. 211, 227 (1974).

"'To obtain a conviction for conspiracy to violate civil rights under § 241, the government must prove that [the defendant] knowingly agreed with another person to injure [a third party] in the exercise of a right guaranteed under the Constitution,' and that there was specific intent to commit the deprivation." *United States v. Lanham*, 617 F.3d 873, 885 (6th Cir. 2010) (quoting *United States v. Epley*, 52 F.3d 571, 575–76 (6th Cir.1995)). "The existence of a [§ 241] conspiracy . . . need not be proven by direct evidence, [and] a common plan may be inferred from circumstantial evidence." *United States v. Gresser*, 935 F.2d 96, 101 (6th Cir. 1991) (citations and internal quotation marks omitted). As such, "a tacit understanding is enough to show a conspiratorial agreement." *Id.* "Furthermore, once a conspiracy has been established, only slight evidence is necessary to implicate a defendant." *Id.*

Thomasine Robinson argues that she did not oppress, threaten, or intimidate any alleged victims, and did not violate their constitutional rights. But the government offered evidence at trial that indicated otherwise, and allowed a reasonable jury to find beyond a reasonable doubt that Thomasine Robinson was guilty of conspiracy to violate civil rights by interfering with rights of voters to cast the votes of their choice and/or have their votes free from dilution by improperly procured votes.

For instance, the testimony of Ginger Stumbo would have allowed the jury to find an agreement between Stumbo and Thomasine Robinson to conspire to improperly submit absentee ballots for Thomasine Robinson under the names of individuals who may not have otherwise voted (in the guise of an effort to help and supervise such individuals), and also an intent by Thomasine Robinson to join that conspiracy through tacit agreement with Stumbo:

> Q. . . . Now, in the fall of 2012, were you asked by Mayor Robinson to help in the election?

A.  Yes.

Q.  And what were you asked to do?

A.  Go around with her and campaigning.

Q.  All right. Were you asked to take documents and obtain absentee ballots for people in housing?

A.  Yes.

Q.  And what did you do in that regard?

A.  We went house to house, asked them if they — she was running for reelection, and she would like to have their vote and ask them if they wanted to vote absentee.  And if they wanted to vote absentee, then we gave them a paper to sign.  They called the clerk's office, and they —

Q.  How many people did you contact that way?

A.  Me personally was — me personally was like four.

Q.  Who are the four you remember?

A.  I remember Bobby Shepherd and Kathleen Tucker.  I'm not sure about the other two, because they were wanting to vote absentee, but they left, and they weren't home when we went back to them.

Q.  And who did you vote these people for? What — did you mark the ballots?

A.  Yes.

*Q.  And did you — who did you vote for?*

*A.  How many — are you wanting to know who I voted them for for mayor?*

*Q.  Yes.*

*A.  Thomasine Robinson.*

*Q.  Would you have voted anyone for Sam Howell?*

*A.  No.*

*Q.  Was it a foregone conclusion that all of those people were going to vote for Thomasine Robinson on their ballot?*

*A. Yes.*

*Q. Okay. Had you discussed that with Thomasine?*

*A. Not in so many words. I mean —*

*Q. Not in so many words. What do you mean by that?*

*A. It was kind of an unspoken thing that she knew that that's who I would vote them for.*

(Emphasis added).

Moreover, Stumbo's testimony would have also allowed the jury to find Thomasine Robinson's knowing agreement to join the conspiracy by directly participating in it: threatening reprisals for those who did not allow Thomasine Robinson and/or her associates to supervise and participate in the filling-out of absentee ballots for Thomasine Robinson:

Q. Now, was Miss Robinson angry after the election?

A. Yes, she was angry. I mean, disappointed, angry.

Q. Let me ask you this. Were you at a meeting at someone's house where that was discussed?

A. I was at her house after the election.

Q. Who all was there?

A. Myself, her daughter Rita, the former mayor, her husband, her other daughter Anna, and her grandchild.

Q. And who?

A. Her granddaughter.

Q. Granddaughter. Did they have a discussion and was there a phone call dealing with evicting somebody because of the election?

A. Yes, sir, there was a phone call.

Q. And who was the phone call to?

A. Ruby Wallen.

Q. And who is Ruby Wallen?

A. She was a resident in the City of Martin plus a tenant of the former mayor.

Q. All right. And did you hear Miss Robinson's side of that conversation?

A. Yes.

Q. *And what did she say to Miss Wallen?*

A. *She said, I told you that if this happened, that I was to lose, that you would be gone.*

Q. *Ruby, I told you if this happened, you would be gone?*

A. *With the election.*

Q. *What was your understanding of what "this happened" was?*

A. *Because —*

Q. *What had just happened is what I'm asking.*

A. *She had lost the election.*

Q. *That's what you interpreted "this happened" to mean?*

A. *Yes.*

Q. *Now, why was she mad at Ruby for losing the election?*

A. *Because Ruby, her husband and two sons voted absentee, but they had filled their own ballots out and mailed them.*

Q. *They filled — somebody filled their own ballots out —*

A. *Without her seeing them, yes.*

Q. *In other words, they didn't play along and let you all vote for them?*

A. *No, they didn't.*

Q. *Did Miss Robinson blame her loss on those votes?*

A. *I mean, that would have been four votes.*

Q. *I'm sorry?*

*A. That would have been four.*

*Q. Did she also get mad at a Nick Stephens?*

*A. Yes.*

*Q. And was that for the same reason?*

*A. He was a tenant of hers, so yes.*

*Q. Did you hear her discuss evicting Nick Stephens?*

*A. I didn't hear her talk to him, but I heard her say that he was going to leave as well.*

Q. Now, what else did you hear in the conversation? Did you hear anything on the other side of the conversation? Could you hear through the phone?

A. I could hear Ruby through the phone. She talks really loud.

Q. What did you hear her say?

A. She said, we voted for you, Thomasina.

Q. She was protesting?

A. Ruby was.

*Q. What did Miss Robinson say?*

*A. She said no, you didn't, you know. You were supposed to let us know your ballots before you — or at least help you with them when you got them.*

*Q. She took that as proof they hadn't voted for her?*

*A. Yes, because her sons were family friends with the mayor now. So she just assumed that's who they had voted for.*

(Emphasis added).

Stumbo's testimony alone would have allowed a reasonable jury to find that Thomasine Robinson knowingly agreed to conspire with Stumbo with the intent to ensure her reelection by coercing Martin voters to vote for her and threatening reprisals — including evictions from residential properties Thomasine Robinson owned — for those who failed to comply. Such a conspiracy violates § 241 by interfering with rights of voters to cast the votes of their choice

and/or have their votes free from dilution by improperly procured votes. "[V]iewing the evidence in the light most favorable to the prosecution, [a] reasonable trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Sease*, 659 F.3d at 523. No more is required to sustain Thomasine Robinson's conviction, and her contention that her conspiracy conviction was not supported by sufficient evidence fails.

### B. Steven Robinson

#### 1.

Steven Robinson first argues that there was insufficient evidence to support his conviction for conspiracy to violate civil rights under 18 U.S.C. § 241. This claim is reviewed *de novo*, and we have already detailed the legal standard to support a conviction under 18 U.S.C. § 241 and the standard of review for a challenge to the sufficiency of the evidence supporting a criminal conviction. *See supra* Part II.A.

Testimony at trial indicated that Steven Robinson went to Robert Clay's house and attempted to coerce him to vote for Thomasine Robinson, despite the fact that Clay had told Steven Robinson that he did not intend to vote:

A. From what I remember, I said I did not plan on voting.

Q. You what?

A. I did not plan on voting.

Q. That's what you told [Steven Robinson]?

A. Yeah.

Q. On election day, did you want to go vote?

A. Yes.

Q. Did you go vote?

A. No.

Q. Why not?

A.  I was afraid to leave my apartment.

Q.  Why were you afraid to leave your apartment?

A.  There were people coming up, asking me to go and vote for Miss Thomasine.

Q.  What were they doing when they came up to your apartment?

A.  Just knocking on the doors, they were calling, just trying to get me to come out, I guess.

Q.  Did you even open the door?

A.  No.

Q.  Did you pretend you weren't there?

A.  Yes.

Q.  And did you ever come out of your house that day?

A.  No.

Q.  Can you identify the people that were knocking on your door?

. . .

Q.  Anyone else come there?

A.  Yes.

Q.  Who?

A.  Stevie [Robinson] and –

Q.  Stevie?

A.  Yes.

Q.  What time of day was he there?

A.  The same day.

. . .

Q.  Okay.  Who were you wanting to vote for in the election?

A.  Sam Howell.

Q. You never got to vote for Sam Howell?

A. No.

That Clay had desired to vote for Sam Howell but did not leave his house to do so because of the presence of Steven Robinson and others would have allowed the jury to find that Steven Robinson's conspiratorial effort amounted to intentional intimidation and oppression of voting rights.

Henry Mullins also testified that Steven Robinson enlisted him in his effort to harass Robert Clay and coerce him to vote:

Q. On election day, did [Steven Robinson] ask you to go look for someone in an apartment?

A. Yes, sir.

Q. And what person did he ask you to go find?

A. Robert Clay.

Q. Robert Clay. And what were you to do with Robert Clay?

A. He told me tell him to go out to vote.

Q. Get him to go vote? What did you do?

A. I went and knocked on his door. No answer.

Q. Sorry?

A. Knocked on his door, no answer.

Q. All right. Did you talk to him?

A. No.

Q. No, not at all?

A. Not Robert Clay till today.

Q. Was anyone with you at the time?

A. No.

Taken together, this evidence was sufficient to allow a reasonable jury to find that Steven Robinson knowingly conspired with Henry Mullins to intimidate, oppress, and coerce Robert Clay to vote for Thomasine Robinson, and that Steven Robinson knowingly joined the conspiracy with the intent of intimidating Robert Clay and coercing him to vote for Thomasine Robinson. "[V]iewing the evidence in the light most favorable to the prosecution, [a] reasonable trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Sease*, 659 F.3d at 523. No more is required to sustain Steven Robinson's conviction, and his contention that his conspiracy conviction was not supported by sufficient evidence fails.

2.

Steven Robinson also argues that the district court erred in requiring, as a special condition of his supervised release sentence, that he abstain from the consumption of alcohol. Because Steven Robinson did not object to this condition when it was imposed, we review it for plain error. *United States v. Kingsley*, 241 F.3d 828, 835 (6th Cir. 2001). A special condition of supervised release must be both procedurally reasonable, which requires that the district court "state in open court the reasons for its imposition of the particular sentence," and substantively reasonable, which requires that the condition be reasonably related to "the rehabilitation of the defendant and the protection of the public." *United States v. Carter*, 463 F.3d 526, 528-29 (6th Cir. 2006).

No plain error occurred here. Steven Robinson had a lengthy history of substance abuse, and a conviction for driving under the influence of alcohol. Robinson also requested a substance abuse treatment program as part of his sentence, which the pre-sentence report recommended. In imposing the special condition of supervised release, the district court chronicled Steven Robinson's history of substance abuse, and concluded that his use of alcohol "could lead to some other problems." The imposition of the special condition of supervised release requiring that Steven Robinson abstain from using alcohol was both procedurally and substantively reasonable; it was not plainly erroneous.

C. James Robinson

1.

James Robinson argues that the district court's reservation of his Rule 29 motion for acquittal made at the close of government's case in chief was an error, and that that error was prejudicial because it required him to dedicate part of his defense to the conspiracy charge and biased the jury by forcing it consider the conspiracy charge during deliberations.

This argument cannot succeed. Our court has already addressed this argument and held that a district court does not err when it reserves a Rule 29 motion made at the close of the government's case in chief: "Federal Rule of Criminal Procedure 29(b) expressly allows a district court to 'reserve decision' on a Rule 29 motion 'where the motion is made before the close of all the evidence.'" *United States v. Mathis*, 738 F.3d 719, 737 (6th Cir. 2013).

James Robinson seeks to avoid the fatal impact of *Mathis* by arguing that it applies only in cases of its precise kind: where the evidence was sufficient to permit submission of the case to the jury, so any erroneous reservation of a Rule 29 motion at the close of the government's case in chief would amount to harmless error. Robinson stresses that in his case there was *not* sufficient evidence to permit submission of the conspiracy to violate civil rights charge to the jury, as evidenced by the fact that the district court ultimately granted his Rule 29 motion, and that his case was actually prejudiced by the district court's reservation of his motion. But these contentions are irrelevant; Rule 29 plainly allows for the reservation of a motion at the close of the government's case in chief, whether or not that motion should ultimately be granted. *Mathis* recognized this, in no way limiting its holding to cases where a defendant's Rule 29 motion will or should be denied. *Id.*

Attempting to reject *Mathis*, Robinson seeks to revive our Court's decades-old holding in *United States v. Reifsteck*, 841 F.2d 701, 703 (6th Cir. 1988), in which we held that "a trial court must rule on a motion for judgment of acquittal made at the close of the government's case in chief, and that it is error to reserve that ruling." Although *Reifsteck* also held that such an error "is harmless if at the close of the government's case in chief the evidence viewed in the light most favorable to the government was sufficient to permit submission of the case to the jury,"

*id.*, Robinson of course argues that no categorical finding of harmlessness applies to his case because the district court ultimately granted his Rule 29 motion, thereby holding that there was not sufficient evidence to permit the submission of the conspiracy charge to the jury.

Of course, *Mathis* clearly controls, but it is worth elaborating on why it is correct in order to clear up some existing confusion in our Circuit's case law.

*Mathis* implicitly recognizes that a 1994 amendment to the Federal Rules of Criminal Procedure plainly supersedes our Court's holding in *Reifsteck*; a district court does not commit error when it reserves a Rule 29 motion for judgment of acquittal made at the close of the government's case in chief.

At the time our Court decided *Reifsteck*, Rule 29 read, in relevant part:

> **(a) Motion Before Submission to Jury.** . . . The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses. . . .

> **(b) Reservation of Decision on Motion.** If a motion for judgment of acquittal is made at the close of all the evidence, the court may reserve decision on the motion, submit the case to the jury and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict.

Fed. R. Crim. P. 29 (1986) (amended 1994, 2002, 2005, 2009). But since amendments to the rule in 1994, the relevant portion now reads:

> **(a) Before Submission to the Jury.** After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. The court may on its own consider whether the evidence is insufficient to sustain a conviction. . . .

> **(b) Reserving Decision.** The court may reserve decision on the motion, proceed with the trial (where the motion is made before the close of all the evidence), submit the case to the jury, and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict. If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved.

Fed. R. Crim. P. 29.

While the pre-1994 version of the rule (the version applied in *Reifsteck*) approves only of a district court reserving a motion for acquittal "made at the close of all the evidence," the post-1994 rule explicitly contemplates that a motion may be reserved and decided before or after a jury verdict "where the motion is made *before the close of all the evidence*" (emphasis added). A motion for acquittal made and reserved at the close of the government's case in chief is necessarily "made before the close of all the evidence" since the defense will then make its case. Therefore, *Mathis* correctly held that the reservation of such a motion is unmistakably permissible according to the plain language of Rule 29(b). Our sister Circuits have reached the same conclusion, *see e.g.*, *United States v. Hunter*, 95 F.3d 14, 16 (8th Cir. 1996) ("Rule 29(b) now permits reserved ruling on motion to acquit made at either close of Government's case or close of all evidence"), and the advisory committee notes to the 1994 amendments support this conclusion, Fed. R. Crim. P. 29 advisory committee's note to 1994 amendments ("The amendment permits the reservation of a motion for a judgment of acquittal made at the close of the government's case in the same manner as the rule now permits for motions made at the close of all of the evidence.").

James Robinson seeks to avoid the fatal impact of *Mathis* and the modern version of Rule 29 by arguing that our Court has continued to apply the *Reifsteck* rule even after the 1994 amendments to Rule 29, but the cases he cites do not prove what he asks them to prove. True, some decisions of our court since 1994 seem to assume that the *Reifsteck* rule survived the 1994 amendments to Rule 29. *See United States v. Owens*, 485 F. App'x 61, 63 (6th Cir. 2012); *United States v. Bennett*, 114 F.3d 1189 (6th Cir. 1997). But in both of those cases, our Court did not directly consider whether the district court actually committed an error by reserving a motion for acquittal made at the close of the government's case in chief. That was because, in each instance, the evidence viewed in the light most favorable to the government was sufficient to permit submission of the case to the jury, meaning that any error would have been harmless. *See, e.g.*, *Owens*, 485 F. App'x at 63 ("The district court's error was harmless because . . . the evidence presented by the government was sufficient to support Owens's conviction."). As such, our Court had no reason to consider whether reservation of the Rule 29 motion was proper. And

even if those unpublished decisions had reflected the state of the law at the time they were issued, they have since been overruled by *Mathis.* James Robinson's argument that the district court improperly reserved his Rule 29 motion therefore fails.

2.

James Robinson next argues that the district court improperly applied a two-level sentencing enhancement for leadership under U.S. Sentencing Guidelines § 3B1.1(c) ("If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in [parts] (a) or (b) [of this section], increase by 2 levels.").

A district court's factual findings underlying a § 3B1.1 enhancement are reviewed for clear error, and "review of the legal conclusion that a person is an organizer or leader under Section 3B1.1 is . . . deferential." *United States v. Washington*, 715 F.3d 975, 982-83 (6th Cir. 2013) (citing *Buford v. United States*, 532 U.S. 66 (2001)).

Here the district court committed no clear error when it found that James Robinson gave Henry Mullins money for the purposes of buying votes, and under our deferential standard of review we find no error in the district court's conclusion that this action amounted to leadership for the purposes § 3B1.1(c).

James Robinson argues that the § 3B1.1(c) cannot be applied to him because his actions amounted to no more than the minimum conduct necessary to support a conviction for vote buying under 42 U.S.C. § 1973i(c) (now 52 U.S.C. § 10307(c)). But the trial record allowed the district court to hold otherwise; James Robinson's payment to Ashley Hale in exchange for her vote was sufficient to support a vote-buying conviction, and James Robinson's furnishing of money to Henry Mullins so that Mullins could purchase votes allowed the district court to apply the § 3B1.1(c) leadership enhancement.

3.

James Robinson also argues that the district court improperly applied a two-level sentencing enhancement for obstruction of justice under U.S. Sentencing Guidelines § 3C1.1, which provides:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

A district court's factual findings underlying a § 3C1.1 enhancement are reviewed for clear error, and the legal application of the sentencing enhancement to the facts is reviewed — somewhat confusingly — *de novo* but deferentially. *United States v. Vasquez*, 560 F.3d 461, 473 (6th Cir. 2009) (citing *Buford*, 532 U.S. at 66).

The district court applied the § 3C1.1 enhancement after finding that James Robinson made menacing gestures and sounds toward three government employees who were actively investigating perjury in his trial (and two of whom were potential witnesses against him), that his actions amounted to an attempt to intimidate, and that such intimidation was sufficient to support an obstruction of justice enhancement.

The district court did not commit clear error when it found that James Robinson menacingly confronted the government employees outside the courthouse by making a noise to get their attention, then staring at them and puffing out his chest. The district court's factual findings about James Robinson's behavior toward the government employees were supported by video footage of the incident and testimony given by two of the three employees involved in the confrontation.

Furthermore, under our deferential standard of review we find no error in the district court's conclusion that James Robinson's behavior in the confrontation amounted to an intentional attempt at intimidation sufficient to support an obstruction of justice enhancement. For the purposes of the § 3C1.1 enhancement, a defendant has obstructed justice when his behavior "can be reasonably construed as a threat." *United States v. Kamper*, 748 F.3d 728, 744 (6th Cir. 2014) (upholding a § 3C1.1 obstruction of justice enhancement). The district court reasonably concluded that James Robinson's behavior could be construed as a threat for the purposes of applying the § 3C1.1 enhancement.

Despite his best efforts, Robinson identifies no cases holding that a confrontation of the sort he instigated cannot support a § 3C1.1 enhancement.  For instance, his briefing dedicates considerable discussion to analogizing his case to *United States v. Bashaw*, in which our court held that a defendant could not be convicted of obstruction of justice for staring at the jury box while attending his brother's criminal trial, and for calling two jurors "motherfuckers" after that trial ended.  982 F.2d 168, 169, 171-73 (6th Cir. 1992) (reversing Bashaw's conviction under 18 U.S.C. § 1503).  Even assuming that our court's holdings on the behavior necessary to support a conviction under 18 U.S.C. § 1503 also define the contours of the behavior necessary to support a § 3C1.1 enhancement, *Bashaw* is of no assistance to Robinson.  First, Bashaw only *stared* at jurors during a trial, 982 F.2d at 173; Robinson made *menacing physical gestures* toward government agents.  Second, Bashaw's verbal abuse of jurors happened *after* trial, leading our Court to conclude that he could not obstruct justice at that time, *id.*; Robinson confronted government agents *during* his trial, when it was still possible for him to obstruct justice.  Like *Bashaw*, the other cases Robinson cites do not support the conclusion that the district court erred in holding that his behavior was sufficient to support an enhancement under § 3C1.1.

4.

Finally, James Robinson argues that his 40-month, above-guidelines sentence is substantively unreasonable.  We review the substantive reasonableness of a sentence for abuse of discretion, even where the sentence imposed is greater than the guidelines range.  *United States v. Smith*, 516 F.3d 473, 477-78 (6th Cir. 2008).  An above-guidelines sentence is not entitled to a presumption of reasonableness, but neither is it presumptively un-reasonable.  *United States v. Liou*, 491 F.3d 334, 337 (6th Cir. 2007) (citations omitted).  "A sentence may be considered substantively unreasonable when the district court selects a sentence arbitrarily, bases the sentence on impermissible factors, fails to consider relevant sentencing factors, or gives an unreasonable amount of weight to any pertinent factor."  *United States v. Conatser*, 514 F.3d 508, 520 (6th Cir. 2008) (citations omitted).  "In reviewing a challenge to the length of an outside-guidelines sentence, we may take the degree of variance into account and consider the extent of a deviation from the Guidelines . . . [but we] must give due deference to the district

court's decision that the § 3553(a) factors . . . justify the extent of the variance." *Smith*, 516 F.3d at 477-78 (citations and internal quotation marks omitted).[1]

James Robinson's guidelines range was 21 to 27 months, and he was sentenced to 40 months. At the final sentencing hearing, the district court explained:

> As I mentioned before and we discussed, the U.S. requested an upward variance because of Mr. Robinson's disregard of the election laws and the terroristic threatening charged after the fact. We discussed the totality of his actions. It seemed to the Court, in light of that, that the intimidation was going unabated, that his actions were more severe when you combine everything that was going on — even post-arrest, which the Court can consider in the *Pepper* [*v. United States*, 562 U.S. 476 (2011)] world — and charges post-trial or during trial, that a slight variance upwards is definitely appropriate in this case and that a variance to 40 months is appropriate when you consider the type of offense, the seriousness of the offense, promoting respect for the law, providing just punishment and avoiding an unwarranted sentencing disparity. . . . If you just consider the conduct underlying the charge, I agree that a guideline sentence would be appropriate. But when you combine that with everything that's occurring after the fact, the total disregard for the laws, the fact that 24 months isn't deterring anyone, and . . . voter intimidation, although obviously the conspiracy is not a part of this, but the intimidation after the fact, the attempt to intimidate law enforcement, the attempt to intimidate witnesses, it seems to the Court that 40 months is a sufficient but not greater than necessary sentence.

In this statement, the district court was referencing to, among other things: that James Robinson was convicted of threatening to kill successful mayoral candidate Sam Howell after the election; that he attempted to intimidate government agents who were potential witnesses against him; and the fact that a 24-month sentence in a similar case had apparently been insufficient deterrence.

The presentence report also allowed the district court to consider James Robinson's age and health status, and the report did not recommend that those factors should impact his sentence.

---

[1] 18 U.S.C. 3553(a) instructs a sentencing district court to consider: "the nature and circumstances of the offense and the history and characteristics of the defendant . . . the seriousness of the offense . . . respect for the law . . . just punishment for the offense . . . adequate deterrence . . . protect[ion of] the public . . . educational or vocational training, medical care, or other correctional treatment . . . the kinds of sentences available . . . the sentencing [guidelines] range . . . any pertinent policy statement [of the Sentencing Commission] . . . the need to avoid unwarranted sentence disparities . . . [and] the need to provide restitution to any victims of the offense."

In total, the record indicates that the district court gave broad and appropriate consideration to the relevant sentencing factors, and that it did not commit an abuse of discretion in determining that a 40-month sentence was "sufficient, but not greater than necessary." 18 U.S.C. 3553(a).

### III.  Conclusion

For the foregoing reasons, we **AFFRIM** the judgments of the district court.