NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0500n.06

No. 24-5847

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Oct 28, 2025
KELLY L. STEPHENS, Clerk

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

JARRETT HOWARD,

    Defendant-Appellant.

)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF
KENTUCKY

OPINION

Before: READLER, MURPHY, and BLOOMEKATZ, Circuit Judges.

MURPHY, Circuit Judge. An informant told the police that Jarrett Howard kept illegal drugs in his apartment. After verifying many of the informant's claims, officers obtained a warrant to search this apartment. They uncovered cocaine, fentanyl, and firearms. A grand jury charged Howard with drug and firearm offenses. Before trial, he told a potential witness that she better not "double-cross" him. A jury later convicted him. Howard now argues that the police lacked probable cause to search his apartment. And he argues that his statement to the potential witness did not justify an obstruction-of-justice enhancement. Both arguments lack merit. We thus affirm.

I

On December 16, 2021, an officer with the Richmond Police Department in Madison County, Kentucky, sought a warrant to search Howard's apartment. In a supporting affidavit, the officer explained that a confidential informant had brought Howard to the officer's attention on

November 29. This informant had provided "accurate and reliable information" in the past and had completed many "controlled drug transactions" for the police. Aff., R.20-6, PageID 130. The informant claimed that Howard sold "pound quantities" of "heroin/fentanyl" in Madison County. *Id.* Howard allegedly kept his drugs in an "upstairs" "bedroom closet" of his apartment. *Id.* He also allegedly kept a handgun in the apartment even though he was a felon. The informant identified the address of Howard's apartment complex and said that Howard lived at unit 5 or 6. The informant also provided many details. Among other things, Howard drove a gray SUV and worked second shift at Bluegrass Plating. He regularly took work breaks at 6 p.m., 8 p.m., and 10 p.m. "to conduct drug transactions" in his employer's parking lot and to travel to his apartment to pick up drugs. *Id.* He also relied on Kyonna Mundy (who "frequent[ed]" his apartment) to help him in his drug business. *Id.* And the informant knew of Howard "smoking marijuana." *Id.*

The officer's affidavit next described his efforts to corroborate the informant's details. The officer confirmed Howard's address at unit 6 of the apartment complex by looking up his driver's license. He also confirmed that Howard had a criminal record, including a felony conviction for trafficking in controlled substances. And he confirmed that Howard drove a gray Honda SUV that he parked outside his apartment.

The officer's affidavit lastly disclosed what he had witnessed when monitoring Howard over December. On December 3, the officer surveilled Howard outside Bluegrass Plating. At 6:00 p.m., Mundy picked Howard up and drove him to his apartment. Howard went inside and came back out two minutes later. Mundy then drove him back to Bluegrass Plating. On December 8, the officer watched Howard travel to "known drug addresses" in Richmond, Kentucky. *Id.*, PageID 131. Howard stayed at one of these addresses for 20 minutes while "multiple vehicles"

made short trips there. *Id.* The officer viewed this traffic as "indicative of drug trafficking" and added that the police had received "drug complaints" about the house. *Id.* A complaining neighbor had seen a man fitting Howard's description arrive at the house and suggested that this man might be its "source of supply[.]" *Id.* On December 16, another officer pulled Howard over for a traffic violation (with Mundy in the passenger seat). *Id.* A police dog alerted to the presence of narcotics, and a search of the vehicle uncovered marijuana. Howard (who also had $500 on his person) took ownership of the marijuana. He claimed that they were driving to a friend's house to smoke it, but the officer later watched them return to his apartment after the traffic stop.

This affidavit proved successful. A state judge issued a warrant to search Howard's apartment. Officers found a substantial amount of incriminating evidence. In the master bedroom closet, they discovered illegal drugs in several baggies: one baggie contained about 417 grams of cocaine and others contained about 287 grams of a mixture that included cocaine and fentanyl. The officers also found (among other things) two handguns, a digital scale, and $34,450 in the same bedroom.

A grand jury indicted Howard on four counts. It charged him with possessing with the intent to distribute both fentanyl and cocaine. *See* 21 U.S.C. § 841(a)(1). It charged him with illegally possessing firearms as a felon. *See* 18 U.S.C. § 922(g)(1). And it charged him with possessing the firearms in furtherance of a drug-trafficking crime. *See id.* § 924(c)(1)(A).

Howard moved to suppress the evidence found at his apartment. He argued that the affidavit did not establish probable cause that the officers would find drugs there. The district court disagreed. It reasoned that the totality of the circumstances alleged in the affidavit provided a fair probability that officers would uncover illegal contraband at Howard's home.

3

Howard stood trial. A jury convicted him of all four charges. At sentencing, the district court imposed an obstruction-of-justice enhancement because it found that Howard had threatened a potential witness. After imposing this enhancement, the court calculated a guidelines range of 262 to 327 months' imprisonment on the first two counts, a guidelines range of 120 months on the third count, and a statutorily required 60-month consecutive sentence on the fourth count. The court varied downward by imposing a total punishment of 300 months.

II

Howard raises two issues on appeal. He argues that the police lacked probable cause to search his apartment. And he argues that the obstruction-of-justice enhancement did not apply.

A. Probable Cause

Under the Fourth Amendment, "no Warrants shall issue" unless an officer identifies facts establishing "probable cause" to believe that the "place to be searched" will contain the "things to be seized." U.S. Const. amend. IV. To meet the probable-cause standard, an affidavit seeking a warrant must establish a "fair probability" that officers will find evidence of a crime at the identified location. *United States v. Sanders*, 106 F.4th 455, 461 (6th Cir. 2024) (en banc) (citation omitted). Courts must consider whether this fair probability exists from the perspective of "reasonable and prudent" people rather than "legal technicians[.]" *Illinois v. Gates*, 462 U.S. 213, 231 (1983) (citation omitted). And they must follow a "totality-of-the-circumstances" approach. *Id.* at 230. So officers may take "[m]any roads" to probable cause. *Sanders*, 106 F.4th at 462.

The officer in this case took one common road: reliance on "tips from informants" that suspects have contraband at their homes. *United States v. Bell*, 2022 WL 59619, at *2 (6th Cir. Jan. 6, 2022); *see Sanders*, 106 F.4th at 462. When considering whether an informant's statements

establish probable cause, courts ask about the informant's reliability and basis of knowledge. *See Gates*, 462 U.S. at 228–39; *United States v. Simmons*, 129 F.4th 382, 388 (6th Cir. 2025). As for reliability, we give greater credit to confidential informants known to the police than to unknown anonymous sources. *Bell*, 2022 WL 59619, at *2; *see Sanders*, 106 F.4th at 464. An informant's past activities with the police also can bolster the informant's reliability. *See United States v. Smith*, 182 F.3d 473, 478–79 (6th Cir. 1999). So can an officer's efforts to corroborate the informant's details. *See id.* at 479–81. As for basis of knowledge, we presume that informants know more about a suspect's crimes when they provide "detailed statements" rather than "conclusory accusations[.]" *Bell*, 2022 WL 59619, at *2; *see Smith*, 182 F.3d at 477. Ultimately, though, an informant's tip need not satisfy both these reliability and basis-of-knowledge factors with equal force to establish probable cause. *See Gates*, 462 U.S. at 233–34. Rather, a significant showing of one can make up for an inadequacy with the other because the final determination depends on the totality of the circumstances. *See id.* And we must give "great deference" to the issuing judge's conclusion that the tip sufficed. *United States v. Christian*, 925 F.3d 305, 311–12 (6th Cir. 2019) (en banc) (quoting *Gates*, 462 U.S. at 236).

Applying this deference here, we conclude that the state judge properly found probable cause based on the informant's claims that Howard stored illegal drugs at his apartment. The officer's affidavit adequately established the informant's reliability and basis of knowledge. *First*, the affidavit showed the informant's reliability in two ways. It described the informant's "past performance" by explaining that the informant had "always" given reliable information and had completed "numerous" controlled buys. *Smith*, 182 F.3d at 478; Aff., R.20-6, PageID 130. It then discussed the "independent investigative work" that corroborated the informant's statements.

*Gates*, 462 U.S. at 244. The officer confirmed that Howard lived at the identified apartment complex, drove a gray SUV, worked at Bluegrass Plating, and associated with Mundy. The officer also confirmed that Howard took a break from his job at 6:00 p.m. to travel to his apartment. And he confirmed that Howard smoked marijuana. Finally, the officer watched Howard make "quick stops to known drug addresses" where many cars came and went—further corroborating his drug business. Aff., R.20-6, PageID 131.

*Second*, the affidavit showed that the informant had an adequate "basis of knowledge" for the tip. *Smith*, 182 F.3d at 481. To be sure, the affidavit did not disclose how the informant learned that Howard distributed "pound quantities" of heroin and fentanyl and kept these illegal drugs in his apartment. Aff., R.20-6, PageID 130–31. But the informant "describe[d] the accused's criminal activity" with the type of detail that showed the informant was relying on something more than rumors. *Smith*, 182 F.3d at 481 (quoting *Spinelli v. United States*, 393 U.S. 410, 416 (1969)). The informant, for example, revealed the precise spot where Howard kept his drugs in his apartment: in a "bedroom closet" that was "located upstairs." Aff., R.20-6, PageID 130. The informant also revealed the precise times that Howard took work breaks to sell drugs: "at 6pm, 8pm, and 10 pm[.]" *Id.* These minute details revealed that the informant had a high level of familiarity with Howard and his drug business. *See Gates*, 462 U.S. at 245–46.

Howard has only one rebuttal: that the tip could have been "stale" because the affidavit did not identify *the date* when drugs were seen in Howard's apartment. Appellant's Br. 12. True, stale information does not provide probable cause. *See Sgro v. United States*, 287 U.S. 206, 210 (1932); *United States v. Frechette*, 583 F.3d 374, 377 (6th Cir. 2009). But the affidavit did not rely on stale information. Although the affidavit did not list dates when the informant saw drugs,

the informant did state that Howard "*is* responsible" for drug trafficking and "*keeps*" drugs at his home. Aff., R.20-6, PageID 130 (emphases added). These present-tense statements showed that the informant described an ongoing drug-trafficking business—not a one-off transaction in the past. *See United States v. Church*, 823 F.3d 351, 356 (6th Cir. 2016). The officer also corroborated the tip with recent surveillance showing that Howard possessed marijuana and visited known drug houses. This "[e]vidence of ongoing criminal activity" forecloses Howard's staleness claim. *United States v. Greene*, 250 F.3d 471, 481 (6th Cir. 2001). And his criticism of the lack of dates improperly reads the affidavit in a "hypertechnical" fashion. *Sanders*, 106 F.4th at 463 (quoting *Christian*, 925 F.3d at 311). When read in the proper commonsense way, the affidavit created probable cause to search the apartment. *See id.*

## B. Obstruction of Justice

At sentencing, a district court must increase a defendant's offense level by two if the defendant has obstructed justice. *See* U.S.S.G. § 3C1.1. This enhancement requires two things. The defendant must have "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction[.]" *Id.* And the defendant's "obstructive conduct" must relate to "the defendant's offense of conviction" or a "closely related offense" (such as a codefendant's). *Id.* A defendant "obstruct[s]" or "impede[s]" a prosecution if the defendant engages in conduct that "block[s]" or "hinder[s]" it. *United States v. Thomas*, 933 F.3d 605, 610 (6th Cir. 2019) (citation omitted). "[T]hreatening" or "intimidating" a potential witness may qualify as the prototypical conduct that fits this definition. U.S.S.G. § 3C1.1 cmt. n.4(A); *see United States v. French*, 976 F.3d 744, 749 (6th Cir. 2020); *United States v. Robinson*, 813 F.3d 251, 263–64 (6th Cir. 2016).

The district court found that this enhancement applied because Howard threatened a woman named Jennifer Mullins. Although Mullins did not testify, the government viewed her as a potential witness because she had signed the lease for his apartment and he had spoken to her while in jail after his arrest. Four days before the trial was set to start, Howard violated the conditions of his pretrial release by visiting Mullins at her parents' home. He claimed that this visit concerned the car insurance for their jointly insured vehicles and asked Mullins if she had made the payments. While speaking with Howard, Mullins called the insurance company to confirm that her payments were up to date. Howard then told her "[d]on't double-cross me" multiple times. McIntosh Tr., R.117, PageID 982. Mullins (who did not know what Howard had "got caught with") interpreted these statements as threatening her to not cooperate with the government in his criminal case. *Id.*, PageID 982–83. She told an officer about the conversation.

The conversation led the district court to take two actions. Before trial, the court revoked Howard's bond. When doing so, it explained that Howard could have simply called Mullins if his visit had really been about insurance. Howard instead showed up at her home, recognizing that she might be a "potential witness" at trial because she had "lived with him at the time of the alleged crime." Bond Revocation Tr., R.117, PageID 991. The court viewed the insurance questioning as "code" and found that Howard had "wanted to see her to intimidate her" about his criminal case. *Id.*, PageID 992. After trial, the court used the conversation to impose the obstruction enhancement. It relied on what it had "already said on the record" to overrule Howard's objections. Sentencing Tr., R.116, PageID 962.

Howard now argues that his statements to Mullins did not obstruct justice under § 3C1.1. He faces an uphill battle under our standard of review. At one time, our cases had chosen

conflicting standards of review for a district court's conclusion that the historical facts triggered § 3C1.1. *See Thomas*, 933 F.3d at 608–10. But we recently clarified that we must review this decision for clear error when a court imposes the enhancement based on a defendant's perjury. *See United States v. Jackson*, __ F.4th __, 2025 WL 2788124, at *3–4 (6th Cir. Oct. 1, 2025). And we see no reason to reach a different result when the obstruction arises from a defendant's threats. In both situations, the enhancement turns on a question of historical fact: Did the defendant commit perjury (in *Jackson*) or threaten a witness (in this case)? *See id.* at *3; *United States v. Johns*, 1998 WL 109986, at *5 (6th Cir. Mar. 4, 1998). And we review a district court's answer to this factual question under a deferential clear-error standard. *See Jackson*, 2025 WL 2788124, at *4. In other words, as long as the record rendered the court's answer to the question "plausible," we must uphold it. *United States v. O'Lear*, 90 F.4th 519, 536 (6th Cir. 2024) (citation omitted).

The district court gave a plausible answer here. The court "reasonably construed" Howard's statements to Mullins "as a threat" not to participate in his trial. *Robinson*, 813 F.3d at 263 (citation omitted). All agree that he showed up at her house out of the blue a few days before trial in violation of his conditions of pretrial release. When he did so, he repeatedly told her not to "double-cross" him. McIntosh Tr., R.117, PageID 982. And Mullins herself took this statement as a threat about his "court trial." *Id.*, PageID 983.

Howard's four responses all come up short. He first claims that he did not know that Mullins might be "a witness" in his case. Appellant's Br. 19. This claim has legal and factual flaws. Legally, the enhancement can apply even when a defendant threatens someone whom the government has yet to identify "as a witness" if the defendant knows that the person might be involved. *United States v. Huntley*, 530 F. App'x 454, 458 (6th Cir. 2013); *see Johns*, 1998 WL

109986, at \*5. Factually, plenty of evidence justified the finding that Howard "believed" Mullins to be a "potential witness" at his trial. Bond Revocation Tr., R.117, PageID 991. Among other things, an officer told her that she was a potential witness over a week before the trial. And because her name was on the apartment lease, Howard even tried to pin the blame on her at trial. In closing argument, his counsel expressed suspicion that she did not testify while noting that she had "free [rein]" over the apartment. Trial Tr., R.115, PageID 919. Mullins would have undercut this defense if she had testified that she knew nothing about the drugs or guns found there. And the district court reasonably concluded that Howard would have known as much before trial.

Howard also claims that his allegedly ambiguous statements to Mullins did not cross the line into a "threat." Appellant's Br. 20. This claim has similar flaws. The enhancement covers more than just overt threats. It also covers ambiguous statements that "can be reasonably construed as" threatening. *Robinson*, 813 F.3d at 263 (citation omitted). That is, it reaches "subtle" threats as much as blunt ones. *United States v. Cannon*, 552 F. App'x 512, 515 (6th Cir. 2014). And the district court reasonably found that Howard sought to "intimidate" Mullins by showing up at her home to tell her not to "double-cross" him. Bond Revocation Tr., R.117, PageID 991–92.

This finding also distinguishes the main case that Howard relies on: *United States v. Archer*, 671 F.3d 149 (2d Cir. 2011). There, the defendant called the witness an "unpleasant name" after learning that he would testify. *Id.* at 166, 168. The Second Circuit held that nobody could interpret this name-calling as "code for a threat[.]" *Id.* at 167. Here, by contrast, the district court reasonably found such "code" language. Bond Revocation Tr., R.117, PageID 992. Far from calling Mullins a name, Howard told her not to "double-cross" him and implied that she should not testify against him. *Cf. United States v. Castro*, 960 F.3d 857, 867–68 (6th Cir. 2020).

10

Howard next seeks to rebut the fact that Mullins felt threatened by his statements. He notes that the enhancement can apply only if he acted with an "intent" to commit a threat—not just if a reasonable person would have taken his statements as a threat. Appellant's Br. 21 (citing *Elonis v. United States*, 575 U.S. 723, 737 (2015)). But *Elonis* was interpreting the federal threat statute, not § 3C1.1. *See Elonis*, 575 U.S. at 726. And § 3C1.1 applies not just to threats but also to efforts to intimidate or influence witnesses. *See* U.S.S.G. § 3C1.1 cmt. n.4(A). Besides, the district court found that Howard did act with an *intent* to intimidate Mullins. And that finding was "plausible" when read against the record evidence. *O'Lear*, 90 F.4th at 536 (citation omitted).

Howard lastly argues that the district court's factual findings at his bond revocation hearing could not "sustain" its later use of the obstruction enhancement. Appellant's Br. 21–22. According to Howard, the court found that he had only "contacted" Mullins when it revoked his bond. This claim misreads the record. The court instead found that Howard had used "code" language "to intimidate her." Bond Revocation Tr., R.117, PageID 992. And these efforts to intimidate a potential witness trigger the obstruction enhancement. *See French*, 976 F.3d at 749.

We affirm.